*872
 
 GUIDRY, Justice.
 
 *
 

 |TOn June 17, 2004, an East Baton Rouge Parish grand jury indicted defendant, Shedran Williams, for the May 22, 2004 first degree murder of Baton Rouge Police Lieutenant Vickie Wax, a violation of La.Rev.Stat. 14:30. Defendant entered a plea of not guilty at his arraignment on June 28, 2004. On June 21, 2005, defendant was allowed to change his plea to the dual plea of not guilty and not guilty by reason of insanity. Jury selection commenced on March 13, 2006, and was completed on March 17th. Trial then commenced on March 20, 2006. On March 22, 2006, the jury, having declined to find defendant was legally insane at the time of the offense, returned a unanimous verdict of guilty of first degree murder. The penalty phase of the trial began the following day on March 23rd. The same day the jury unanimously returned a sentence of death based on two of the three aggravating circumstances urged by the state: 1) the victim was a peace officer engaged in her lawful duties and 2) the offender knowingly created a risk of death or great bodily harm to more than one person. The jury rejected defendant’s claim that he was mentally retarded by leaving the mental retardation verdict form blank. On May 25, 2006, the district court imposed the sentence of death by lethal injection in accordance with the jury’s verdict.
 

 |2Under La. Const, art. V, § 5(D), defendant now appeals his conviction and sentence of death asserting forty-five assignments of error. We address the most significant of these errors in this opinion, and the remaining errors will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, for the following reasons we affirm defendant’s first-degree murder conviction and the imposition of the death sentence.
 

 FACTS
 

 On May 22, 2004, defendant, Shedran Williams, then 33 years old, was in the process of moving to a new apartment in Baton Rouge, having been released from prison at Winn Correctional Center approximately one month earlier. So that he would not miss work at Mr. C’s Auto Shop, the salvage yard owned by his former stepfather, defendant enlisted the help of his cousin, Deangelo Hammond, and a friend, Jason Martin, to move his furniture for him. After Hammond and Martin finished moving defendant’s furniture into his apartment, they went back to pick up defendant when he finished his work day because defendant did not have a car. To repay the favor, defendant asked Hammond to stop at a drug store so that he could buy them some beer and vodka. After that, defendant had a few more errands to run, including picking up two women to join them for a party. Finally, defendant wanted linens for his new bedroom suite, so he asked that they make one last stop at the Wal-Mart, located on the corner of Perkins Road and Acadian Throughway.
 

 Defendant entered Wal-Mart and placed in his cart merchandise including pillows, sheets, and a comforter. After a while, Martin went inside the store to use the restroom and to see how much longer defendant’s shopping was going to take. While in the store, Martin observed defendant hide two disposable cameras in his rear pants pocket underneath his shirt, and not wanting any part of what that action might | ¡¡portend, Martin returned to
 
 *873
 
 Hammond’s SUV and told him that his cousin was “buying sixty dollars’ worth of merchandise but he was stealing about twenty dollars’ worth of merchandise.”
 

 Wal-Mart’s loss prevention manager, Garrett Douget, also observed defendant concealing the cameras and suspected that he had witnessed a shoplifting. Douget was in plain clothes and followed defendant to the check-out counter, taking the place in line directly behind defendant.
 

 As the clerk, Angela Ranson, began ringing up his purchases, defendant engaged her in flirtatious small-talk, complimenting her on her hair style and offering to bring her breakfast the following morning. Ranson noted that defendant decided not to purchase two items in his buggy, a cordless phone and some bar soap, and those items were set aside in the return bin. Simultaneously, Douget watched defendant’s transaction and noted that the two disposable cameras were not among his purchases, because Douget could see the cameras in defendant’s pocket as he leaned over to talk to Ranson. Defendant persisted in trying to convince Ranson to give him her phone number even after he had completed his purchase.
 

 Eventually, defendant proceeded to exit the store. After defendant had passed all possible points of sale without paying for the cameras, Douget confronted him in the store’s vestibule. Douget identified himself as Wal-Mart security and asked defendant, “What about the items under your shirt there?” Defendant removed the cameras and handed them over saying, “I can explain that.” When defendant offered to pay for the merchandise, Douget declined, and pointed for him to turn around and step back into the store to speak to the police officer on duty. Defendant turned and took one step toward the victim, Lieutenant Vickie Wax, a twenty-seven-year veteran Baton Rouge Police officer working security at Wal-Mart in full police uniform, but 14defendant then turned back to make a run for the exit, shoving his way past Douget.
 

 Douget and Lt. Wax each grabbed one of defendant’s arms and attempted to handcuff him, but only successfully secured the cuff on his left hand before a struggle ensued. Defendant knocked Lt. Wax to the floor and fell on top of her. Douget landed on top of defendant, sandwiching defendant between himself and Lt. Wax.
 
 [1]
 

 Stanford Wilson, a Wal-Mart customer, witnessed defendant striking the female officer and entered the fray to help. Lt. Wax called out, “He’s got his hand on my gun.” Moments later, defendant had removed Lt. Wax’s gun from its holster and gained control of it. Douget stepped back and told defendant to “just get out of here.” Defendant got up and yelled for everybody to “get back,” and everyone obliged. Although the witnesses said there was no impediment between defendant and the exit door, defendant turned around inside the vestibule, pointed the gun at Lt. Wax and fired, striking her in the center of her forehead at her hairline. Lt. Wax fell face down on the floor and defendant shot her again, striking her in the center of her back. Defendant then shot Douget in the back as he was trying to get away. Defendant then shot Wilson twice, hitting him in the chest and neck. Defendant then fled the store.
 

 
 *874
 
 Lt. Wax died almost immediately from her wounds. Wilson was in critical condition from his injuries, but survived. Doug-et’s injury was painful, but not life-threatening.
 

 In the meantime, Hammond, along with Martin and the two women, had driven away when they noticed defendant wrestling with the policewoman and the security guard, followed by the sound of gunshots. With his cousin gone, defendant ran into the Wal-Mart parking lot. The first vehicle he attempted to enter was occupied by | ⅞ twelve-year-old Bria Jenkins and her younger niece; however, they had locked the doors while Bria’s mother was inside the store. Next to their car was a Chevy Corsica occupied by Karyn Garnett and Abraham Washington. Defendant accessed the backseat of their vehicle, pointed the gun he was still holding at them, and yelled, “Drive, drive or I’ll kill you.” Garnett and Washington fled from the vehicle. Defendant jumped into the driver’s seat and sped off, hitting a parked car on his way. Defendant eventually abandoned the vehicle, which the police located some two hours after the incident.
 

 Late into the night and the following day, detectives processed the crime scene, retrieving evidence and interviewing eyewitnesses. Items known to have been touched by the shooter, including the disposable cameras, the cordless phone box, and the abandoned Chevy Corsica were dusted for fingerprints. A fingerprint lifted from one of the cameras matched defendant’s known prints in the police data bank. From that, the police developed a six-person photo lineup, which included defendant’s picture along with five fill-in photographs of men with similar features. On May 23, 2004, the police interviewed Garrett Douget in his hospital room and showed him the photo lineup. Douget positively identified defendant as the person who shot him, Lt. Wax, and a customer.
 
 [2]
 
 A warrant for defendant’s arrest for the first degree murder of Lt. Vickie Wax issued on May 23, 2004. On May 24, 2004, Baton Rouge Police Department Chief Pat Englade received a call from defendant’s stepfather that defendant wanted to turn himself in. Several uniformed officers arrived at the salvage | ¿yard auto parts business where defendant had worked for his stepfather and arrested defendant without incident. The officers advised defendant of his
 
 Miranda
 
 rights.
 
 [3]
 
 Thereafter, Chief Englade asked defendant what he did with the police officer’s weapon, to which defendant replied that he “threw it in the river by one of the casinos.”
 
 [4]
 

 DISCUSSION
 

 As defense counsel conceded to the jury in oral argument, the primary issue at the guilt phase of trial, as well as the penalty
 
 *875
 
 phase of trial, was defendant’s “mental capacity” at the time of the offense. Defendant changed his plea to not guilty and not guilty by reason of insanity, and therefore sought to prove at trial that he was legally insane at the time he killed Lt. Wax and shot Mr. Douget and Mr. Wilson. What transpired at the guilt phase, however, was not simply testimony as to whether or not defendant was insane at the time of the offense, but also what diminished mental capacity he may have been experiencing at the time of the offense and whether he is mentally retarded, issues more properly presented to the jury in the penalty phase of the trial. However, neither party made any objection to taking the testimony of the expert witnesses for the defense and the state in this manner, i.e., entirely within the guilt phase of trial. Indeed, it was the defense that introduced defendant’s expert’s testimony at the guilt phase as to insanity, diminished capacity, and mental retardation. Though these issues were all addressed contemporaneously by counsel and the witnesses during the taking of the testimony, we point out that the jury was clearly and properly charged by the district court as to the distinct issues it was to [7determine at the guilt phase (insanity) and at the penalty phase (mental retardation and mitigating circumstances). Therefore, as discussed more fully below, we do not find the jurors were confused on the issues or the evidence before them. At any rate, with the understanding that the testimony of the defendant’s expert encompassed insanity, mental retardation, diminished capacity, and mitigation, we will address the assignments of error concerning the not guilty by reason of insanity defense and the mental retardation defense in that order.
 

 Plea of Not Guilty by Reason of Insanity
 

 In assignment of error No. 27, defendant asserts he was legally insane at the time of the offense and argues the state presented no evidence upon which a verdict to the contrary could be supported.
 

 Under La.Rev.Stat. 14:14:
 

 If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
 

 However, in Louisiana there is a legal presumption that the defendant is sane and responsible for his actions. La.Rev. Stat. 15:432;
 
 State v. Poree,
 
 386 So.2d 1331 (La.1979). Therefore, to overcome this presumption of sanity, the defendant has the burden of proving by a preponderance of the evidence that he suffered a mental disease or a mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.Code Crim. Pro. art. 652;
 
 State v. Armstrong,
 
 94-2950, pp. 4-5 (La.4/8/96), 671 So.2d 307, 309;
 
 State v. Silman,
 
 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32;
 
 State v. Peters,
 
 94-0283, pp. 8-9 (La.10/17/94), 643 So.2d 1222, 1225-26. Sanity is a factual matter for the jury, to be determined from all of the evidence, both lay and expert, along with | ¡^circumstances surrounding the events and testimony relating to the defendant’s behavior before, during, and after the crime.
 
 State v. Price,
 
 403 So.2d 660, 663-64 (La.1981);
 
 State v. Claibon,
 
 395 So.2d 770, 772 (La.1981);
 
 State v. Roy,
 
 395 So.2d 664, 668-69 (La.1981). A determination of the weight of the evidence is a question of fact that rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of
 
 *876
 
 the evidence most favorable to the prosecution must be adopted.
 
 State v. Silman,
 
 95-0154, p. 12, 663 So.2d at 35.
 

 In reviewing a claim for insufficiency of evidence in an action where the affirmative defense of insanity is raised, the appellate court, applying the standard set forth in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorably to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
 
 State v. Peters,
 
 94-0283, p. 8, 643 So.2d at 1225;
 
 State v. Armstrong,
 
 p. 4, 671 So.2d at 309;
 
 State v. Nealy,
 
 450 So.2d 634, 639 (La.1984).
 

 In the present case, defendant changed his initial plea of not guilty to the dual plea of not guilty and not guilty by reason of insanity. Accordingly, defendant bore the burden of establishing by a preponderance of the evidence that he suffered from some mental disease or defect on May 22, 2004, that rendered him incapable of distinguishing between right and wrong with regard to the killing of Lt. Wax and the shooting of Mr. Douget and Mr. Wilson. The defense theory was that defendant suffers from an acute stress disorder triggered by physical restraint and that he was | rendered unable to distinguish right from wrong on the night of the offense when Mr. Douget and Lt. Wax confronted him. To carry that burden, the defense called Dr. Louis Cenac, a board-certified psychiatrist, who examined defendant on March 10, 2006, for approximately three hours, and reviewed various documents and records provided by defense counsel, including those from Baton Rouge General Hospital’s Chemical Dependency Unit (hereinafter, “BRGH-CDU”), records from correctional facilities in which defendant had been incarcerated, and police investigative reports of the instant offense and prior offenses.
 
 [5]
 
 Dr. Cenac opined that, at the time of the offense, defendant did not know right from wrong because he was suffering from a “specific phobia ... when you grab him, he will react.” Based on this and prior incidents with law enforcement officers, which Dr. Cenac discussed in some detail, Dr. Cenac diagnosed defendant as suffering from a “kind of phobia, a specific fear, fear of being restrained.” Dr. Cenac described the phobia as a recurrent pattern, “when you grab him, he reacts physically, violently, and he doesn’t hear what you’re telling him.” In Dr. Cenac’s view, “under stressful conditions [defendant] demonstrates a predictable pattern of non-responsiveness to auditory commands and violence towards people who touch him.” Dr. Cenac concluded defendant “was impaired in his capacity to comprehend and to comply with the verbal orders of the arresting store detective on May 22, 2004,” and further, that defendant had “a diminished capacity to appreciate the consequences of his behavior” on that night.
 

 On cross-examination, the prosecutor sought to undermine confidence in Dr. Cenac’s testimony, though Dr. Cenac was to some extent able to parry the thrusts
 
 *877
 
 of hpthe prosecutor in that regard. Confronted with defendant’s records from the Hunt Correctional Center, Dr. Cenac conceded he had reviewed neither those records (which were not introduced in evidence and are the subject of other assignments of error) nor the records from Red River Treatment Center (which, the jury was informed, had been destroyed by the facility itself), but he offered to do so if they were made available. Dr. Ce-nac reiterated that the defendant did not know right from wrong the night of the shooting because he was reacting to being restrained. Acknowledging that it was important to look at what other people around defendant said about him, Dr. Cenac admitted that, other than defendant himself, he had not interviewed eyewitnesses and did not sit through their testimony at trial, except for the defendant’s testimony. But Dr. Cenac pointed out that he had observed how jail personnel gave defendant a wide berth under a high level of security and that he had read various police reports and statements of witnesses, all of which were compiled closer in time to past relevant events and, thus, were more trustworthy in his view. Although the prosecutor attempted to portray Dr. Cenac as holding stubbornly to his opinions in the face of the admission that he had not reviewed all of the materials he perhaps could have reviewed, Dr. Cenac nevertheless felt confident that he had made a valid mental evaluation of defendant based on the materials he had reviewed and conceded that, if the facts upon which an expert opinion is based are changed, then the opinion may of necessity change as well. Aside from his assessment that defendant was insane on the night of May 22, 2004, due to a particular phobia and stress disorder, Dr. Cenac cited no other medical diagnosis for insanity. As to whether he knew if defendant had ever been treated for a mental illness, Dr. Ce-nac noted that he could not answer that question because, as the prosecutor had just made |nknown to him, not all of defendant’s records had been made available for his review.
 
 [6]
 

 Defendant also testified at the guilt phase and his testimony tended to advance the defense theory that he has a pattern of aversion to being touched, particularly by persons of authority. He related the details of an arrest made in 1993 or 1994 when he was in Don Carter Bowling Lanes in Baton Rouge and three uniformed police officers, all Caucasian males, approached to question him. Defendant described the officers as “really showing too much authority” and related that he and the officers “[got] into a little tussle” when one of them approached him. In addition, defendant described the instant offense at Wal-Mart starting because the “big white guy ... jammed me up.” In the altercation that ensued, defendant’s “concern [was], man, what you touching me for, what you putting your hands on me for.... I’m just click, you know, some prejudice, I said some prejudice shit about to jump off, you know what I’m saying? I’m really like messed up about this man touching me, you know what I’m saying? ... Don’t touch me ... what did you touch me for, don’t touch me.... I’m not going to allow
 
 *878
 
 just anybody just to touch me.”
 
 [7]
 

 Although the defense argues there was no evidence introduced by the state to rebut Dr. Cenac’s testimony, we find there was sufficient contradictory evidence upon which the jury could rationally rely in either rejecting Dr. Cenac’s testimony as unconvincing or giving it little weight in the face of other evidence and testimony relating to the issue of insanity. First, Hammond, defendant’s cousin, and Martin, his friend, testified to the surrounding events and defendant’s behavior before, during, 112and after the crime. Both Hammond and Martin recalled moving defendant’s furniture to his new apartment for him while he worked at his stepfather’s salvage business on the day of the murder. According to their testimony, neither of them had any problem understanding defendant or communicating with him that day so that he understood them.
 
 [8]
 

 Further, defendant’s own testimony as to the events of May 22, 2004, tended to support a finding that he was not incapable of distinguishing right and wrong at the time of the offense. “I had went to work that day ... it was a good day, we was making a lot of money.... I was running the shop ... everything was going good ... just like normal little business things.” Defendant was able to convince his cousin and a friend to move the furniture which his father had given him, “a brand new bedroom set,” so that he would not need to take off work that day. Exhibiting an understanding of repaying a favor, defendant had wanted to do something nice for Hammond and Martin in exchange for what they had done for him. “It was a Saturday night, it was payday ... I had made a little money ... and I was going to show them a good time.” So defendant had his friends stop by Rite-Aid, and he purchased some beer and some vodka for them. “I wanted to do it pretty nice for 'em.” Next, defendant wanted to pick-up some women to “get a little party going on,” and he was anticipating “maybe have a three-some or a five-some, or whatever [ ] I could lay around there and afford to do, that’s what I wanted to do.” Defendant further testified that he realized he needed some sheets, pillows and a comforter for his new bed, so he asked his cousin to stop by Wal-Mart, where he sought the assistance of a store clerk to select blue | ^linens. During his testimony, he recalled rolling his basket through the store, “just trying to do the right thing.” Defendant flirted with the Wal-Mart check-out girl, “I’m being polite ... I’ve got about three girls coming to my apartment, then I got like a little date ... me and a little chick, we made small conversation ... shoot my stick, you know what I’m saying, and trying to get her phone number.”
 

 Upon being confronted by Mr. Douget, the loss prevention associate, defendant further exhibited an awareness of distinguishing right from -wrong. Mr. Douget recalled that after defendant passed the last point of purchase without paying for the cameras, “I identified myself as Wal-Mart security and I asked for the mer
 
 *879
 
 chandise back ... the cameras.” According to Mr. Douget, defendant “absolutely” responded “clearly and intelligently:”
 

 He said ‘okay.’ He took them out and he handed them over. And he said, ‘I can pay for them.’ I said, ‘No, that’s okay.’ I said, ‘Let’s just go back inside.’ I pointed to Lieutenant Wax and I pointed back inside.
 

 Tellingly, there came a moment during the incident when defendant had escaped from Lt. Wax, Mr. Douget, and Mr. Wilson, and thus was no longer being restrained or touched by anyone. Several witnesses testified that defendant stood up with the gun in his hand, that there was no obstruction or person between him and the exit door, that he was told by various people, including at least one who had not attempted to restrain him, to leave and to not shoot, but that he nonetheless aimed the gun and shot Lt. Wax two times, shot Mr. Wilson two times, and shot Mr. Doug-et once. One witness described the gun shots as not rapid gunfire but “like he was aiming.” Thereafter, defendant exhibited full appreciation that the actions he had just taken were so serious that the only course left to him was to escape. As set forth above, defendant eventually obtained at gun point a vehicle in which he fled the scene. One of the occupants volunteered that the man who entered their car with a |14gun and a handcuff dangling from his left hand looked “paranoid.” When defense counsel tried to develop the “paranoid” assessment into something akin to insanity, the witness clarified that he meant, “He was looking like he did something wrong.” Accordingly, all of the eyewitness accounts reasonably support the jury’s apparent finding that defendant could distinguish between right and wrong on the night of May 22, 2004, and that he was not insane at the time of the offense.
 

 Finally, in its rebuttal case, the state presented Dr. Donald Hoppe, a clinical psychologist, who had reviewed Dr. Ce-nac’s report and who disputed Dr. Cenac’s diagnosis of defendant suffering from “touch phobia,” finding it “highly suspect.” Dr. Hoppe testified that he had extensively researched the condition and found that such a diagnosis is very rare. He explained that the phobia, most frequently diagnosed in individuals who suffer from autism, has to be a long-standing pattern of persistent fear of touch that occurs in all situations. However, by defendant’s own admission, Dr. Hoppe noted, he enjoyed sexual intimacy, including with multiple partners simultaneously, and he had on his own initiative hugged his cousin when they greeted. Dr. Hoppe found such behavior inconsistent with a diagnosis of a fear of being touched under the standard set forth in the American Psychiatric Association,
 
 Diagnostic and Statistical Manual of Mental Disorders
 
 (4th ed.2002) (hereinafter, “DSM-IV”). Dr. Hoppe explained to the jury that “the response to a phobic situation is always avoidance, never violence.”
 

 Although defendant now argues to this court that Dr. Hoppe apparently misunderstood Dr. Cenac’s diagnosis of an “acute stress disorder” as one of “touch phobia,” defense counsel did not elect to cross-examine Dr. Hoppe on any aspect of his testimony. Nor did counsel address Dr. Hoppe’s testimony in his closing argument, except to point out that Dr. Hoppe did not interview defendant, a comment Jisto which the State objected.
 
 [9]
 
 The jury
 
 *880
 
 in this case, before deciding the factual issue of insanity, was required to make credibility determinations among the witnesses and to decide what weight, if any, to give the testimony of the expert witnesses. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the “fact finder’s discretion only to the extent necessary to guarantee the fundamental due process of law.”
 
 State v. Mussall,
 
 523 So.2d 1305, 1310 (La.1988). Therefore, when viewing the evidence presented in the light most favorable to the prosecution, we find the jury’s rejection of defendant’s insanity claim based on a particular phobia, i.e., its conclusion that defendant did not prove by a preponderance of the evidence that he suffered from a mental disease- or mental defect which rendered him incapable of distinguishing right and wrong at the time of the offense, was a rational determination, fully supported by the record. This assignment of error lacks merit.
 

 Claim of Mental Retardation
 

 In assignment of error No. 1, defendant urges that his death sentence violates the Eighth Amendment to the United States Constitution because he proved by a preponderance of the evidence that he is mentally retarded and, therefore, he is ineligible for capital punishment under
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
 

 In
 
 Atkins,
 
 the Supreme Court held that execution of mentally retarded persons constitutes an excessive punishment, and thus violates the Eighth Amendment of the United States Constitution.
 
 See also State v. Williams,
 
 01-1650 (La.11/1/02), 831 So.2d 835. Thereafter, the legislature enacted La.Code Crim. Pro. art. 905.5.1(A), which mandates that no person who is mentally retarded shall be subjected to a sentence of death and sets forth the procedure to be used when a capital defendant raises a claim of mental retardation. To prevail on his claim, the defendant has the burden of proving mental retardation by a preponderance of the evidence. La.Code Crim. Pro. art. 905.5.1(C)(1). The legislature has set the standard for mental retardation as:
 

 a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
 

 La.Code Crim. Pro. art. 905.5.1(H)(1). This standard implicitly incorporates the definition of mental retardation set out in La.Rev.Stat. 28:381(28)(significant subav-erage general intellectual functioning “existing concurrently with deficits in adaptive behavior ... manifested during the developmental period”), and is equivalent to the standard articulated in the DSM-IV. Both standards require a two-
 
 *881
 
 pronged finding of: significant subaverage intellectual function and significant limitations in adaptive functions; and both require an onset age under 18 years, because mental retardation is by definition a developmental disorder that must manifest itself at the developmental stages of life.
 
 [10]
 

 | ^Psychological, social and medical conditions that may be considered but that “do[ ] not necessarily constitute mental retardation” are listed in La. Code Crim. Pro. art. 905.5.1(H)(2). The list includes: behavioral disorders; difficulty in adjusting to school; emotional disturbance; environmental, cultural, or economic disadvantage; learning disabilities; lack of educational opportunities; mental illness; personality disorders; sensory impairments; and a temporary crisis situation; all of which were presented by the defense in this case. La.Code Crim. Pro. art. 905.5.1(H)(2)(b), (d), (e), (g), (i), (k), (o), (p), and (r). And in
 
 Atkins,
 
 the United States Supreme Court suggested factors to consider for the determination of mental retardation:
 

 Clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.
 

 Atkins,
 
 536 U.S. at 318, 122 S.Ct. at 2250-51.
 

 118In light of the standard articulated in
 
 Jackson v. Virginia, supra,
 
 for reviewing the sufficiency of the evidence, we find that, to sustain a sentence of death in
 
 *882
 
 which mental retardation is at issue pursuant to La.Code Crim. Proc. art. 905.5.1, the court, viewing the evidence in a light most favorable to the prosecution, must determine that a rational trier of fact could have concluded that the defendant did not prove by a preponderance of the evidence that he is mentally retarded under Art. 905.5.1. We applied this standard in our recent decision in
 
 State v. Lee,
 
 05-2098 (La.1/16/08), 976 So.2d 109, wherein we considered the defendant’s claim that he had carried his burden of proving mental retardation by a preponderance of the evidence. Based on the expert and lay testimony presented to the jury in that case, we concluded “[t]he jury’s unanimous decision that defendant is not mentally retarded, and thus that he failed to carry his burden of proof, is neither irrational nor arbitrary.”
 
 Lee,
 
 05-2098, pp. 58-59, 976 So.2d at 147. With that standard in mind, we turn to the evidence presented to support the defendant’s claim of mental retardation.
 

 Under Art. 905.5.1(C)(1), “[t]he jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge.” In the present case, the mental retardation issue was tried to the jury at the penalty phase.
 
 [11]
 
 However, as |19noted above, the defense’s mental health expert, Dr. Cenac, testified at the guilt phase on the issue of mental retardation, as well as on the issues of insanity and diminished capacity. The defense introduced Dr. Cenac’s expert report at the penalty phase, along with the introduction by the state of the evidence and testimony presented at the guilt phase.
 

 Dr. Cenac expressed to the jury his opinion that the defendant is mildly mentally retarded. He initially noted the records he had reviewed and summarized defendant’s medical and family backgrounds, including a history of alcoholism and violence. Dr. Cenac explained that the diagnosis of mental retardation is not just a number score, referring to IQ, but includes a finding of inadaptability, i.e., whether the person is capable of adapting to society’s norms and expectations. He first noted that defendant was diagnosed as mentally retarded in first grade, had been enrolled in special education classes since, and in 7th or 8th grade was admitted to the BRGH-CDU for possible cocaine use. At BRGH-CDU, Dr. Cary Rostow, a psychol
 
 *883
 
 ogist whom Dr. Cenac knew well and with whom he had previously worked, evaluated defendant at the age of seventeen and prepared a report, which Dr. Cenac reviewed. According to that report, Dr. Rostow found defendant to have an IQ of approximately 73, categorizing him as mildly mentally retarded.
 
 [12]
 

 |2nPr. Cenac reiterated that a diagnosis of mental retardation, however, is not just a number score but also includes the finding of inadaptability. He described defendant’s history as exemplifying a pattern of inadaptability, present throughout his life, such that defendant is “essentially inadaptable.” Dr. Cenac then reviewed defendant’s educational history, noting the many different schools defendant attended but at which he did not succeed. Dr. Cenac related that defendant was released from the BRGH-CDU program early because he could not comprehend or function in the program, according to a report prepared by Dr. Leon Bombet, a pediatrician. Defendant’s criminal history commenced from when he was ten years old, for being a runaway, and eventually totaled some twenty-one arrests for various offenses. Dr. Cenac extensively covered seven of these arrests in both his report and trial testimony.
 
 [13]
 
 The circumstances of these arrests, according to Dr. Cenac, revealed that many of them came about or escalated in seriousness because of defendant’s fear of being touched, his inability to think in the abstract, and his inability to hear and comprehend what others are saying to him in stressful situations. Dr. Cenac identified defendant as exhibiting a “repetitive pattern of being predictably unpredictable when challenged.”
 

 Dr. Cenac noted that, as further evidence of inadaptability, defendant has never been able to live independently, cannot remember his own address, relies on others to solve his problems, and learns by rote or by hand rather than verbally or through abstract reasoning; in other words, he has “concrete thought processes.” Rather than adapt to his limitations, Dr. Cenac explained, defendant uses a defense mechanism |21of omnipotence; he is grandiose and possesses an inflated self-esteem, as exemplified by defendant’s own testimony that he held a favored position in the family and did not have to pay bus fares because people liked him. In discussing defendant’s “ambivalence” as a result of wanting to “do right” but also to do “what the streets wanted,” Dr. Cenac noted that, while defendant might express his intention to “do right,” he does not have the brain power to even rent an apartment, and the only suitable employment for him would be working for a relative. Although Dr. Cenac acknowledged defendant had attended Camelot Career College, which defendant considered a program one passes just for attending class,
 
 *884
 
 Dr. Cenac pointed out that the school was not comparable to a university; people like defendant should be taught and could learn to do things by rote, such as in a restaurant-like environment.
 

 Based on the results of the tests done by Dr. Rostow and other evidence, Dr. Cenac, citing the DSM-IV, made a multi-axial diagnosis including mental retardation. On the first axis, how a person presents at a point in time, Dr. Cenac found defendant to have poly substance abuse, but without psychological addiction due only to his periods of incarceration, a specific situational-type phobia of violently reacting to touch or being grabbed, and an acute stress disorder, resulting in some impairment of consciousness and awareness. On the second axis, which is a longitudinal view of personality and adaptability, Dr. Cenac noted defendant has mild mental retardation and meets all the criteria for anti-social personality disorder (“not planful,” behavior is predicated on stimulus, and transgresses the rights of others). On the third axis, which pertains to physical causes, Dr. Cenac stated defendant had a period of brain trauma at the age of seven, which can be associated with personality change and decreased intelligence. As to the fourth axis, the state of the person’s current stress disorders, Dr. Cenac stated defendant was under moderate to severe _jjgstress due to the fact he was facing the possibility of capital punishment. Finally, as to the fifth axis, the current level of adaptive functioning, Dr. Cenac opined that defendant was functioning quite poorly-
 

 Dr. Cenac further stated that defendant has a tendency toward psychotic distortion, in that when under stress he does not reflect on things, instead he acts. Based on the observations of correctional officers and police officers who had dealt with defendant, Dr. Cenac explained that, under stressful conditions, defendant demonstrates a predictable pattern of non-responsiveness to auditory commands and violence towards people who touch him. Dr. Cenac opined that defendant was impaired in his capacity to comprehend and comply with the verbal orders of the arresting store detective on the night of May 22, 2004, and that he had a diminished capacity to appreciate the consequences of his behavior that night.
 

 The state’s cross-examination exposed, and Dr. Cenac conceded, that in arriving at his expert opinion regarding defendant’s mental status, he may not have reviewed all of defendant’s records, though he did review “every word” of those provided to him by defense counsel. Dr. Cenac was impressed that defense counsel had provided him with the entire defense file, something he had not previously encountered. Nonetheless, Dr. Cenac on cross-examination revealed that he had focused primarily upon the results of one out of the four IQ tests defendant had undergone, namely Dr. Rostow’s 1988 evaluation.
 
 [14]
 
 Dr. Cenac could not recall | ^having
 
 *885
 
 reviewed the 1996 record from Hunt Correctional Center, but, as noted above, he offered to review those and any other records the state would provide. When advised by the prosecutor that defendant had been tested four times and that his IQ had been going up each time, Dr. Cenac opined that such progression demonstrates “a practice [e]ffect.” In keeping with the tone of the exchange between the prosecutor and the witness, the prosecutor announced that the defense expert “clearly [ ] didn’t review all pertinent records.” Defense counsel admitted, “I don’t have the Hunt records or [Dr. Cenac] would have had 'em.”
 
 [15]
 
 The absence of all of the IQ tests from Dr. Cenac’s review led the prosecutor to suggest that the defense expert was basing his diagnosis of mild mental retardation on testing that occurred eighteen years previous. Dr. Cenac confirmed, “That is correct.” Dr. Cenac stressed, however, that defendant was mentally retarded at the age of seventeen and he was still retarded at the age of thirty-five, his age at the time of trial. Although Dr. Cenac refused to reconsider his diagnosis even after learning that he had not reviewed all of defendant’s records, he noted that his professional opinion was based on the records he was actually provided and that such a professional opinion could necessarily change if the underlying information changed.
 

 The prosecutor also brought out the fact that, not only were the records reviewed incomplete, but the interviews Dr. Cenac conducted in formulating his [^mental status determination of defendant also appeared equally limited, because he had interviewed no one other than the defendant. Dr. Cenac interviewed none of the eyewitnesses present at Wal-Mart who could attest to defendant’s behavior as they observed it at the time of the shooting; moreover, Dr. Cenac elected not to sit in the courtroom to hear the eyewitness testimony to learn the relevant conduct of defendant during the offense because to have done so would have meant he would have had to cancel appointments with patients. Consequently, Dr. Cenac had no opinion with respect to the earlier testimony regarding how normal defendant’s behavior had been just prior to the crime. However, Dr. Cenac stated that he had reviewed the police reports and the statements of the witnesses, which he believed more accurately reflected the events because they had been prepared more closely in time to those events.
 

 The state’s rebuttal expert, Dr. Hoppe, a clinical psychologist, challenged Dr. Ce-nac’s finding of mild mental retardation as being contrary to the standards set forth in the DSM-IV because defendant’s lowest IQ test score was 73, and even that falls outside the threshold of 70 and below. Dr. Hoppe initially stated that the standard for
 
 *886
 
 mental retardation is very clear and longstanding. He explained that first and foremost is an IQ less than 70, and then second the person must be shown to have a failure to develop adaptation or life skills. Here, Dr. Hoppe noted, the only data he had seen placed defendant’s IQ above 70; therefore, “right off the bat, that throws the whole retardation thing out, it doesn’t meet the established criteria.” He continued:
 

 And that, that’s every piece of data I saw and everything I heard testified to today, places his IQ above the scientific cut-off for that diagnosis. So there is absolutely no debate. He cannot be mentally retarded, given the IQ scores that have been presented here and the ones that were made available to me. It’s just impossible, it doesn’t meet the scientific criteria.
 

 12iiPr. Hoppe also disputed Dr. Cenac’s assessment of inadaptability by inviting the jurors to recall defendant’s own testimony:
 

 I was certainly struck by the apparent resourcefulness of the defendant when he testified, in response to his own attorney’s questions. He, his demeanor changed drastically when he [the prosecutor] began to question him.... He is very resourceful. He may not have a lot of book-smarts but this man, by his own admission, is very street-smart. And that’s a type of adaptive behavior. He could talk all about what brands of vodka to buy to impress people. He knew about application and credit reports to sign a lease. He was able to talk about a valid driver’s license at Enterprise, to rent a car. This is not something you hear from someone who is mentally retarded. This man is well aware of what society requires and expects. He doesn’t comply with it. But failure to comply with societal expectations is different from the inability to comprehend or understand societal expectations.
 

 Dr. Hoppe further found a lack of trustworthiness in Dr. Cenac’s diagnosis because he had “based his entire diagnosis of mental retardation on Dr. Rostow’s report, which is incorrect.” Dr. Hoppe explained that, while he heard Dr. Cenac say that defendant could not think abstractly, he looked specifically at the test scores recorded by Dr. Rostow and the highest score was for abstract thinking. Although this score was still below average, Dr. Hoppe explained, the score for abstract thinking was not in the deficient range but in the borderline range, and was one of defendant’s strengths.
 

 Defendant’s trial testimony and his apparent demeanor on the stand supports the jury’s finding that he was not mentally retarded. The testimony tends to show the defendant’s ability to communicate (he could comprehend and respond to questions appropriately); his ability to recall past events from his childhood, his schooling, and all of his arrests and incarcerations; his ability to understand and anticipate the reactions of others; and his ability to learn from experience.
 
 See At
 
 kins, 536 U.S. at 318, 122 S.Ct. at 2250-51. Indeed, defendant exhibited a self-awareness that he was a product of the streets — “I’m used to what I was raised up into my hood.” — and that |2f;he had learned to survive in that arena. For example, defendant explained to the jury how cars could be rented in exchange for drugs; that he could afford to have his apartment cleaned for $20, “a little drug here and there, you can get somebody to pay you;” and that he did not even have to pay to ride the bus as long as he knew the driver.
 

 Defendant also informed the jury that on the day of the shooting, he was working at his former stepfather’s salvage business.
 
 *887
 
 He explained to the jury that as part of his job, he would compare another company’s price versus his price and try to “underbid” his competition to sell the parts. At the time of the offense, defendant claimed, he was making anywhere from $100 to $800 per day, and was saving some of that money. A rational jury could have concluded that defendant exhibited some measure of intelligence and sufficient adaptive skills to survive in the environment of his choice. Defendant’s testimony, particularly with respect to his adaptive skills, if accepted by the jury, tended to negate a reasonable likelihood that he qualified as mentally retarded. The jury heard no further evidence of mental retardation at the penalty phase, although counsel argued for such a finding in closing argument (“What you have here is a child in a man’s body.”), and attempted to cast doubt on Dr. Hoppe’s testimony by noting he had not interviewed the defendant.
 

 Applying the
 
 Jackson v. Virginia
 
 standard to the instant case, we find, based on our thorough review of the record evidence, that the jury’s unanimous decision that defendant failed to prove mental retardation by a preponderance of the evidence was not irrational, as it was fully supported by the record. We find the jurors had sufficient evidence on which to conclude the defendant failed to show “significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills.” La.Code Crim. Proc. art. |g7905.5.1(H)(l).
 
 See State v. Lee,
 
 05-2098, p. 59, 976 So.2d at 147. It was within the jury’s wide purview to make credibility determinations and decide the weight of the expert testimony.
 
 See State v. Mussall,
 
 523 So.2d at 1310. While the determination of whether a defendant is mentally retarded is inherently an intensively factual inquiry, we do not find the jury acted either irrationally or arbitrarily in unanimously deciding that this defendant is not exempt from capital punishment based on a claim of mental retardation.
 
 See State v. Lee,
 
 05-2098, pp. 58-59, 976 So.2d at 147.
 

 Alleged Errors in Testimony of State’s Expert Witness
 

 In assignments of error Nos. 2 and 14, defendant alleges Dr. Hoppe, the State’s expert witness, misstated the law on mental retardation when he testified that there is an IQ cut-off of 70. Thus, defendant contends the jury’s sentence of death violates the Eighth and Fourteenth Amendments to the United States Constitution. Defendant avers Dr. Hoppe incorrectly testified that an IQ score over 70 precluded a diagnosis of mental retardation, because Louisiana law does not specify a numerical cutoff. He quotes Dr. Hoppe’s testimony:
 

 Something that keeps getting talked about here is this issue of mental retardation. There is a very clear standard for mental retardation. It has been around for over a hundred years. It is the one and only standard that we have. And it is that there be, first and foremost, an I.Q. of less than seventy. And then, in addition to that, that the person is shown to have a failure to develop adaptation, you know, to develop life-skills. But, first of all, you have to establish an I.Q. of less than seventy, beginning before the age of eighteen.
 

 We find defendant’s claim is without merit. First, defense counsel made no objection to Dr. Hoppe’s testimony, nor did counsel cross-examine the witness to expose to jurors what the defendant now alleges were the witness’s erroneous statements of the law. Second, while La.Code Crim. Proc. art. 905.5.1 does not specify a threshold IQ score for a finding of mental
 
 *888
 
 retardation, the Supreme Court in
 
 12»Atkins
 
 noted that “ ‘[mjild’ mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.”
 
 Atkins,
 
 536 U.S. at 309, n. 3, 122 S.Ct. at 2245, n. 3 (quoting DSM-IV, pp. 42-43). Thus, the DSM-IV itself, relied upon and referenced by Dr. Hoppe and, to some extent, Dr. Cenac, indicates that an IQ of 70 marks a potential threshold for mild mental retardation. Indeed, Dr. Ce-nac on cross-examination agreed that the DSM-IV so provided.
 
 [16]
 
 At any rate, while we are careful to point out that neither our legislature nor our jurisprudence has set forth a specific IQ score for determining intellectual functioning in the capital sentencing context, this court, like the
 
 Atkins
 
 Court, has recognized that mental health experts and the medical literature have acknowledged an IQ of 70 as “the line demarcating mild mental retardation.”
 
 See State v. Anderson,
 
 06-2987, p. 16 (La.9/9/08), 996 So.2d 973, 989;
 
 State v. Williams,
 
 01-1650, pp. 23-24, 831 So.2d at 853-54;
 
 State v. Dunn,
 
 01-1635, p. 28 (La.11/1/02), 831 So.2d 862, 885. Accordingly, in the testimony of Dr. Hoppe, a clinical psychologist who referenced the DSM-IV cited in
 
 Atkins,
 
 we detect nothing that would preclude the jury from rationally relying on his testimony.
 

 Moreover, as both Dr. Cenac and Dr. Hoppe explained, intellectual functioning is but one prong of the mental retardation equation: adaptive skills must also be considered in the analysis. “A low I.Q. score, alone, does not equate to a finding of mental retardation.”
 
 State v. Campbell,
 
 06-0286, p. 25 (La.5/21/08), 983 So.2d 810, 829. Although defendant cites jurisprudence from various federal and state court decisions in which the threshold for the intellectual functioning prong has ranged | ^between 70 and 75, he omits any discussion of the adaptive skills prong, which must also be considered in making a determination of mental retardation. As we determined earlier in this opinion, there was sufficient evidence upon which the jury could have reasonably found that the defendant failed to prove he also lacked adaptive skills, even if his IQ fell within the borderline range. Defendant’s own testimony demonstrated a range of adaptive skills by which he had parlayed his street education to a relatively high level. In the face of this testimony from defendant, as well as that of Dr. Hoppe, the jury evidently made a credibility determination and found Dr. Cenac’s assessment of defendant’s claimed inadaptability unconvincing. Because we conclude there was no demonstrable error in Dr. Hoppe’s testimony as to assessing intellectual functioning, and because there was another basis on which the jury could have reasonably found that defendant failed to prove mental retardation, we do not view the jury’s apparent credibility determinations as irrational, and thus we find no violation of the defendant’s constitutional rights.
 

 Motion for Recess to Review the Hunt Correctional Center Records
 

 The Hunt Correctional Center records, which contained the results of the
 
 *889
 
 1996 and 1999 IQ tests, figured prominently in the State’s cross-examination of Dr. Cenac and are the subject of a number of assignments of error.
 
 [17]
 
 In assignment of error No. 12, defendant asserts the district court erred in denying his motion for a one-hour recess to allow Dr. Cenac the opportunity to review the Hunt Correctional Center | snrecords when the prosecutor confronted the witness during cross-examination with the results of these other IQ tests.
 

 La.Code Crim. Proc. art. 708 defines a recess as “a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced.” A motion for recess is evaluated by the same standards as a motion for a continuance.
 
 State v. Warren,
 
 437 So.2d 836 (La.1983). A motion for continuance may be granted in the discretion of the court if there is any good ground therefor. La.Code.Crim. Proc. art. 712. The decision to grant or deny a recess lies within the discretion of the trial court and will not be overturned absent an abuse of that discretion.
 
 State v. Hampton,
 
 98-0331 (La.4/23/99), 750 So.2d 867, 877. Where’ the defense, at the time the motion was made, did not make a showing of a compelling reason for granting a recess, it cannot be said the trial court abused its discretion by refusing the recess.
 
 State v. Richmond,
 
 284 So.2d 317, 326 (La.1973).
 

 We find no abuse of the trial court’s discretion in the denial of the defendant’s motion for recess to review the Hunt Correctional Center records. As previously set forth, any defendant in Louisiana who claims mental retardation as a bar to capital punishment has the burden of proving the claim by a preponderance of the evidence. La.Code Crim. Proc. art. 905.5.1(C)(1). Thus, it was incumbent upon the defense to ensure that its mental health expert, who was to testify in support of the defendant’s claims of insanity and mental retardation, was fully cognizant of and had reviewed all necessary and available documents concerning the defendant’s mental health status. The trial court evidently found no compelling ground for granting the recess, nor do we find that defense counsel established such at the time of the motion.
 

 In this case, the record establishes that the defense had ample opportunity before trial commenced on March 20, 2006, to secure the Hunt Correctional Center records, Isithat a copy of the Hunt records was placed in the trial record, and that defense counsel declined the State’s offer of a copy of the records it had received from the Department of Corrections (hereinafter, “D.O.C.”). At a hearing on April 6, 2005, nearly one year before trial, defense counsel advised the court that he had not obtained all of defendant’s records from the D.O.C., even though he had caused a subpoena to issue. The trial judge attempted to expedite the process by instructing counsel that he could easily obtain defendant’s records and that it would take “however long it takes to drive up to D.O.C. and back, probably, or a phone call ... you know you can get those records yourself through [defendant] requesting them. They don’t have to be
 
 *890
 
 issued through a subpoena by the court.” Defense counsel indicated he would do so. The court, though it denied the defendant’s request to change his plea, set a subsequent hearing for counsel to report on the status of developing his case as to defendant’s mental status, including the plea of not guilty by reason of insanity.
 

 At the May 5, 2005 hearing, defense counsel indicated he could not obtain some of the D.O.C. records, but the State was “pretty certain” that it had been provided with all the records. Defense counsel declined the State’s offer of a copy of the D.O.C. records, indicating he wanted the records from the D.O.C. The trial court again denied the defendant’s request to change his plea on the basis that the defense had not provided a psychological report, which defense counsel claimed was due to lack of funds and because he did not have all the records. The State again indicated it would provide the defense with a copy. At a hearing on May 12, 2005, counsel indicated he had funds to hire a psychiatrist, while the trial court stated it now was in possession of the D.O.C. records, would review them, and provide a copy to counsel. Then, on June 21, 2005, the trial court reviewed the D.O.C. records and stated it would provide the defense with a copy and place a copy in the record. The defendant was allowed |Si>to enter an insanity plea without objection, and the trial court set a new trial’date. Finally, on September 15, 2005, defense counsel indicated that all discovery motions had been satisfied.
 

 Although the trial record does not reflect whether the defense ever independently obtained the Hunt Correctional Center records, the record does show the State, and the trial court as well, did obtain the D.O.C. records for the defendant, and that these records were in fact offered to trial counsel, who declined to take the copy offered by the State, preferring instead to secure them himself. There is no doubt that the trial record contains a copy of the Hunt records, as defendant concedes in this court. The possible omission of the Hunt records from the mental health records provided to Dr. Cenac came to light during the state’s cross-examination of Dr. Cenac, who responded to the State’s query that he had not seen the Hunt records, prompting defense counsel to state: “I have Winn Correctional, D.O.C. records and everything else, but, to my knowledge, I don’t have the Hunt records or [Dr. Cenac] would have had 'em.” Defendant and his counsel could have readily obtained the Hunt records, apparently declined the copy offered by the State, could have reviewed the copy placed in the trial record, or may have even been provided with a copy by the trial court. Therefore, we find no abuse of discretion in the trial court’s ’denial of the motion to recess to allow Dr. Cenac to review the Hunt records.
 
 [18]
 

 Alleged Prosecutorial Misconduct
 

 In assignments of error Nos. 3 through 11 and 13, defendant contends pervasive prosecutorial misconduct resulted in an unfair trial and an unreliable and arbitrary |33mposition of the death penalty. Defendant argues the prosecutor unlawfully impugned Dr. Cenac’s credibility by misstating the facts, mischaracterizing his testimony and questioning him on IQ test
 
 *891
 
 scores that were not properly introduced at trial. Defendant asserts the credibility of Dr. Cenac was pivotal to the defense, because defendant’s claims of insanity, mental retardation, and mitigating circumstances turned on whether the jurors believed Dr. Cenac’s testimony on these issues. Essentially, he contends the prosecutor overstepped all reasonable bounds of propriety, comparing the prosecutor’s conduct here to the misconduct of the government attorney in
 
 Berger v. United States,
 
 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). He further contends the trial court failed to take any steps to cure those errors. For the reasons below, which address defendant’s arguments in turn, we find no merit to these assignments of error.
 

 Improper Comments By Prosecutor Regarding the Hunt Correctional Records
 

 Defendant argues the prosecutor made misstatements regarding the contents of the 1996 Hunt Correctional Center records during his cross-examination of Dr. Cenac and again during his closing argument. Particularly, defendant faults the prosecutor for making misleading references to the highest score from the 1996 TONI, which yielded intelligence test results in the “72 to 78 range.” Defendant claims the prosecutor “mischaracterized the facts contained in these documents” when he cross-examined Dr. Cenac, and caused Dr. Cenac to appear to jurors as stubborn, defensive, or evasive. He further complains the Hunt records were never introduced into evidence, and that it was, therefore, error for the prosecutor to reference them.
 

 Much of defendant’s argument turns on his assertion that the prosecutor made specific reference to the “high” score of 78 from the 1996 TONI during his cross-examination of Dr. Cenac, and then repeated that misleading reference during closing ^argument. However, the transcript reveals the prosecutor did not refer to the score of 78 during his cross-examination of Dr. Cenac, though he did make reference to that score of 78 during closing argument in the guilt phase.
 
 [19]
 
 This IQ score was not admitted in evidence; therefore, the reference to the score of 78 arguably fell outside the bounds of proper ar
 
 *892
 
 gument. La.Code Crim. Proc. art. 774.
 
 [20]
 
 However, defense counsel did not contemporaneously object to the reference to this score during the State’s closing argument.
 
 [21]
 
 Because defense counsel voiced no objection during the portions of the State’s closing arguments about which defendant now indirectly | .^complains, any error in the guilt phase was not preserved for appellate review. La.Code Crim. Proc. art. 841.
 
 [22]
 
 Further, with regard to the penalty phase argument, we do not find the prosecutor exceeded the scope of proper argument in generally referencing the existence of scores higher than 73, because Dr. Hoppe testified as to having reviewed IQ scores for the defendant that were higher than 73, i.e., that such scores existed, and the defense chose neither to object to his testimony nor to cross-examine him.
 

 Furthermore, we find no prejudicial error in the State’s references to the Hunt Correctional Center records in the cross-examination of Dr. Cenac. Although defendant argues the prosecutor referenced facts outside the record, primarily the TONI scores contained in the Hunt records, we find the Hunt records were the subject of proper cross-examination.
 

 The State in the present case was entitled to cross-examine defendant’s mental health expert for being unaware, or for possibly having ignored, the 1996 and 1999 intelligence tests administered subsequent to defendant’s 1988 WAIS-R test, which had yielded a full-scale IQ of 73. The State’s question to Dr. Cenac as to whether he had considered the intelligence testing performed on defendant at Hunt Correctional Center was within the scope of proper cross-examination, because the prosecution has the right to rebut the evidence adduced by the defense.
 
 See State v. Constantine,
 
 364 So.2d 1011, 1013 (La.1978);
 
 see generally
 
 La.Code Evid. art. 611(E). Throughout the testimony of Dr. Cenac, the defense sought to present a picture of defendant as mildly mentally retarded, in the absence of a eontempora-
 
 *893
 
 neous IQ test of defendant, by relying exclusively on the WAIS-R test administered eighteen years before defendant’s trial. The State was entitled to inquire into the defense expert’s bases for making his assessment, including whether he had considered testing administered more recently than the 1988 test on which he had relied. On cross-examination, the questioner “has traditionally been allowed to impeach, or discredit, the witness.”
 
 State v. Draughn,
 
 05-1825, pp. 47-48 (La.1/17/07), 950 So.2d 583, 616(quoting
 
 State v. Robinson,
 
 01-0273, p. 6, (La.5/17/02), 817 So.2d 1131, 1135). Moreover, under La.Code Evid. art. 607(D)(1), “[e]xtrinsic evidence to show a witnesses] bias, interest, corruption, or defect of capacity is admissible to attack the credibility of a witness.” Therefore, the State was entitled to use the Hunt records as extrinsic evidence to discredit the testimony of Dr. Cenac, particularly with respect to the apparently incomplete sources upon which he had based his opinion of mental retardation. Defendant, via his claim of mental retardation, had placed his intellectual functioning at issue; therefore, the prosecutor’s targeted questioning of the defense expert about more recent IQ testing was proper under La.Code Evid. art. 611(B), because a witness may be cross-examined on any matter relevant to any issue in the case, including credibility.
 

 Even if defendant could show that the higher TONI scores obtained in 1996 and 1999 have diminished significance when considered alongside his 1988 WAIS-R full scale IQ score of 73, see n. 17,
 
 supra,
 
 the prosecutor presented the Hunt records to Dr. Cenac, and without referencing a numerical score, informed the expert that defendant had been tested four times and that his scores had increased with every test. As|a7discussed above, Dr. Cenac was able to explain that such an increase in testing scores was likely the result of a “practice [e]ffect,” and thus did not necessarily change his opinion that the defendant had mild mental retardation. Furthermore, regardless of whatever tests on intellectual functioning were presented, those results were only one part of the mental retardation evaluation, with the other part being adaptive skills, and we have previously determined the jury could have reasonably found on the evidence that the defendant had failed to prove inadaptability in life skills.
 

 Improper Cross-Examination of Defense Witness
 

 We next turn to defendant’s assertion that the State during cross-examination of Dr. Cenac “made unduly prejudicial comments about his credibility.” Further, he claims that the prosecutor repeatedly interrupted Dr. Cenac and became argumentative with the witness. We have addressed some of defendant’s arguments previously, and do so again below. We find no merit to his claims that the prosecutor, though forceful in his cross-examination of Dr. Cenac, engaged in prosecuto-rial misconduct requiring reversal of the conviction and a new trial.
 

 The State’s questions to Dr. Cenac were clearly intended to expose what the State reasonably believed were weaknesses in the witness’s direct testimony. Defendant points to the following colloquy during cross-examination as evidencing the prosecutor’s line of improper questioning and comments:
 

 A. He met the criteria for mental retardation.
 

 Q. And that criteria is what?
 

 A. As I explained to you, he had — he was tested by a psychologist, he had I.Q. in the appropriate range, and he had mal-adaptive—
 

 Q. My question is: What is that appropriate range?
 

 
 *894
 
 A. Your Honor,—
 

 Q. Is it not seventy or below and he tested at 73 in 1988—
 

 At that point, defense counsel objected to the prosecutor interrupting the witness, to which the prosecutor retorted: “He knows how to move away from a question when jsshe wants to.” The trial judge overruled the defense objection and ordered the witness to answer the question. Again, the prosecutor questioned Dr. Cenac on the criteria he had employed for diagnosing mental retardation:
 

 Q. My understanding, my review of the literature is that range has to be seventy and below, is that a true statement or an incorrect statement?
 

 A. It says that in the DSM-IV. However, if you would read the next two sentences, it says that the clinician makes the determination, based on a pattern of inadaptability of the patient. And Dr. Rostow, in his initial, which was the second testing, made the diagnosis initially, of mental retardation. I saw him, he’d made that at seventeen, I saw him at aged thirty five. Nothing changed, he was mentally retarded at seventeen, he’s mentally retarded today.
 

 Q. So the answer was, it is seventy but you get to choose a different number, if you so desire—
 

 The trial court again overruled defense counsel’s objection.
 

 Contrary to defendant’s refrain, the prosecutor did not mischaracterize Dr. Ce-nac’s testimony. Dr. Cenac’s desire to focus on the inadaptability prong rather than the IQ test scores and intellectual functioning necessitated the prosecutor to question the witness more specifically, as the transcript reveals. To the extent that the prosecutor “undermined Dr. Cenac’s credibility by making it seem like the doctor had arbitrarily and unprofessionally concluded that the defendant is mentally retarded,” as defendant now argues, that is the purpose of effective cross-examination and did not constitute prosecutorial misconduct.
 

 Improper and Prejudicial Character Comments
 

 Defendant next complains the State, in its guilt phase rebuttal argument, made an “improper and prejudicial comment about the number of times [] defendant had been arrested.” Specifically, the prosecutor invited the jury: “[Ljet’s examine She-dran, who’s been arrested more times than probably everyone in this whole courtroom; in the court building maybe.” Defendant further asserts the prosecutor |S9asked improper questions of the defense expert, made improper comments during the guilt and penalty phases regarding defendant’s future dangerousness, and voiced his opinion that death was the appropriate penalty on facts outside of the record. We find no reversible error with regard to these comments and questions by the prosecutor.
 

 Defense counsel failed to preserve the claims by raising a contemporaneous objection when the prosecutor made the comments above. La.Code Crim. Proc. art. 841;
 
 State v. Wessinger, supra.
 
 In any event, notwithstanding the procedural bar, a review of the claims reveals that they are baseless, because defendant’s arrest record as well as his present and possible future dangerousness were introduced to the jury by the defendant’s own witness, Dr. Cenac, as well as the defendant’s own testimony. Thus, the prosecutor’s comments do not fall outside the scope of proper closing argument as they were reasonably restricted to the evidence admitted, to the lack of evidence, and to conclusions of fact that may be drawn therefrom. La. Code Crim. Proc. art. 774.
 

 
 *895
 
 With regard to defendant’s prior arrests, during Dr. Cenac’s direct examination, defense counsel framed the question to his expert witness: “You mentioned that he had 21 arrests, I believe on his rap sheet.” Dr. Cenac went on to summarize defendant’s criminal history of convictions, detailing seven of the prior arrests. Defendant himself admitted to having been arrested several times. Given that defendant opened the door to his criminal record by taking the stand, and his expert specifically detailed in his direct examination a number of arrests occurring before defendant’s arrest for the murder of Lt. Wax, we find nothing in the State’s guilt phase rebuttal argument exceeded the scope of proper closing argument. La. Code Crim. Proc. art. 774.
 

 Similarly, we find no merit to the claim that the prosecutor posed improper |4nquestions to Dr. Cenac on cross-examination about defendant’s “dangerousness,” or, during the State’s closing argument, improperly referred to Dr. Cenac’s observations on the defendant’s dangerousness. Specifically, defendant argues that, by asking, “So what you’re telling the ladies and gentlemen of the jury is that he’s a very dangerous person?”, the State introduced improper evidence of bad moral character and other crimes, wrongs or acts under La.Code Evid. art. 404(B), thereby requiring reversal.
 

 The context in which the state’s question was posed demonstrates that the defense expert initiated the discussion of defendant’s dangerousness. The prosecutor had been asking about various jobs defendant was able to hold down, notwithstanding his purported mental limitations, including lawn maintenance work and completing a course study at the culinary arts institute that led defendant to search for a job as a cook. The State asked Dr. Cenac if that information would color his opinion:
 

 A. I think he’s capable of doing many jobs in a kitchen environment. And I think that’s a good location for that percentage of our population, who can do repetitive work like that. It’s a good idea, to place him in such a position, save for the fact that there are knives.
 

 Q. So what you’re telling the ladies and gentlemen of the jury is he’s a very dangerous person?
 

 A. I think he’s an extraordinarily dangerous person.
 

 Q. And the only way to — there is no way to insure prison guards’ safety, is that correct?
 

 A. I think there’s a high risk for officers. ...
 

 Defense counsel remained silent and voiced no objection to the candid remarks and responses that defendant’s own expert yielded on cross-examination. Dr. Cenac brought up the notion of dangerousness when he pondered that defendant would be suited to kitchen work, except for the access to knives, i.e., dangerous weapons. Contrary to defendant’s assertions, the prosecutor’s follow-up question to Dr. Ce-nac |41was neither exploitive nor improper.
 
 [23]
 

 
 *896
 
 Thereafter, the State was entitled to argue dangerousness in its closing arguments, because testimony to that effect had been admitted at trial. La.Code Crim. Proc. art. 774. In its guilt phase rebuttal argument, the prosecutor told the jury: “Dr. Cenac was right that he is extremely dangerous, because he is, in fact, a hard core criminal.” In its penalty phase rebuttal argument, the prosecutor argued: “His own expert tells you [defendant is] an extremely dangerous man.” We do not construe anything in the prosecutor’s brief remarks as a “tactic of turning the defense expert’s testimony against defendant.” The prosecutor’s statements did not exceed the bounds of La.Code Crim. Proc. art. 774.
 

 Defendant further asserts the prosecutor’s theme of defendant’s future dangerousness in his penalty phase rebuttal argument interjected an arbitrary factor into the jury’s sentencing determination. Specifically, defendant points to the following passage as prejudicial:
 

 What will protect anyone in prison? What will protect the other inmates? There is nothing. Actually, I was wrong. There is one thing that will protect the other people, his death. That’s the only thing that will protect the world from [defendant].
 

 While a prosecutor may not advert to his own opinions as to the appropriateness of the penalty at the sentencing stage of a capital case,
 
 State v. Kaufman,
 
 304 So.2d 300, 306-07 (La.1974), he will avoid interjecting an arbitrary factor into the proceedings by basing his comments on the same evidence that jurors have also heard and may evaluate for themselves. Here, the jurors had been well-versed in defendant’s outbursts of rage, not only by the eyewitnesses to the murder of Lt. Wax, but also from defendant himself, who admitted on the stand to getting into “tussles” with law enforcement. At the penalty phase, defendant’s step-father also testified that defendant could become out of control when angered. Additionally, his own mental health expert pronounced him “extraordinarily dangerous” and questioned the safety of any prison personnel surrounding him. With this background, jurors would not have been surprised or shocked to hear that the State’s prosecution team favored the death penalty as to defendant, and certainly the State had alerted jurors as early as voir dire that it would be asking for such a verdict. The instant record shows clearly that the prosecutor’s remark about defendant’s death being the only way to protect other people from him referred to the evidence presented and did not merely express the prosecutor’s personal opinion based on information not disclosed to the jurors. Furthermore, we do not find that the prosecutor’s comment interjected an arbitrary or prejudicial factor into the penalty phase deliberations. Accordingly, we find no merit to these arguments.
 

 Trial Court’s Rulings Compounded the Prosecutorial Misconduct
 

 In addition to the denial of the motion to recess to review the Hunt records, a claim we have previously addressed, defendant argues the trial judge erroneously overruled various defense objections during the State’s cross-examination of Dr. Cenac. As discussed previously, the prosecutor commented that Dr. Cenac might have been evasive: “He knows how to move away from a question when he wants to.... ” Elsewhere, when the Hunt records were presented to Dr. Cenac on cross-examination, the prosecutor responded to defense counsel’s motion
 
 *897
 
 to recess as follows: “There’s |4Sno need. Clearly, he didn’t review all pertinent records. So his opinion stands on what he — .” In defendant’s view, the entire episode regarding the Hunt records tarnished Dr. Cenac’s credibility in the eyes of the jurors.
 

 We find no abuse of the trial court’s broad discretion in overruling defense counsel’s objections to the State’s cross-examination of Dr. Cenac.
 
 See
 
 La.Code Crim. Proc. art. 17. The inherent power of the court includes the “duty to require that criminal proceedings shall be conducted •with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done.”
 
 Id.
 
 Although defendant argues these comments further served to impugn unfairly Dr. Ce-nac’s credibility, we find no reversible error has been demonstrated. As we have previously explained, the trial court did not abuse its discretion in denying the motion to recess. Further, we do not find that the prosecutor’s comments on Dr. Cenac’s testimony merit reversal. The record reveals that when the trial court denied the defense’s objection and motion for a one-hour recess, the prosecutor moved on and asked Dr. Cenac no additional questions about the Hunt records. Under these circumstances, we find no abuse of the trial court’s broad discretion in overruling defense counsel’s objections.
 

 Prosecutor Propounded State’s Rebuttal Expert’s Misstatements of the Law
 

 Defendant reiterates the same claims he made with regard to the State’s expert’s testimony, but does so this time from the perspective that the State committed pros-ecutorial misconduct by allowing its rebuttal expert, Dr. Hoppe, to misstate the law of mental retardation with respect to an IQ cutoff at 70. Because we detect nothing in the testimony of the State’s expert that would preclude the jury from rationally relying on that testimony, we find no merit to the defendant’s arguments here regarding prosecutorial misconduct.
 

 __|j¡¿Capital Sentence Review
 

 Under La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. Rule 28, this court reviews every sentence of death imposed by Louisiana courts to determine if it is unconstitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
 
 State v. Lee,
 
 05-2098, p. 59, 976 So.2d at 147.
 

 The Department of Public Safety and Correction submitted a Capital Sentence Investigation Report (hereinafter “CSIR”).
 
 See
 
 La. Sup.Ct. Rule 28 § 3(b). In addition, the district court judge filed the Uniform Capital Sentence Report (hereinafter “UCSR”) required by La. Sup.Ct. Rule. 28 § 3(a). The State filed a Sentence Review Memorandum, and the report of defendant’s mental health expert, Dr. Cenac, was introduced into evidence during the penalty phase.
 

 Those documents, along with defendant’s guilt phase testimony, as well as the penalty phase testimony of defendant’s relatives, indicate that defendant, Shedran Williams, is an African-American male, born on September 30, 1970, in Baton Rouge, Louisiana, to the marital union of Sammy and Catherine Williams.
 
 [24]
 
 Defen
 
 *898
 
 dant’s parents divorced when he was young, and between the ages of three through seventeen, defendant drifted back and forth between the two households, depending on which parent could manage him for the time being. His father remarried and had two other sons; defendant’s mother lived for a time with Charles Stir-gus, the owner of | ,lsMr. C’s Auto, and they had two sons. In 1992, defendant’s mother married Michael Robinson, and stayed married to him until her death in June 2004.
 

 Defendant lived most of his life in Baton Rouge. As a special education student, he was educated in various public schools before eventually dropping out. While incarcerated at Winn Correctional Center, defendant earned a certificate in food services, which reflected that he completed the course with a 2.35 grade point average.
 

 Defendant’s employment history is sporadic. By his own account, he worked at Sports Academy on Plank Road in the summers during high school. In 1990, he enrolled in the Job Corps in Ozark, Arkansas, but was discharged after two or three months for drinking alcohol and using drugs. At the time of his arrest on the instant offense in May 2004, defendant had been employed at his stepfather’s business, Mr. C’s Auto on Airline Highway in Baton Rouge, for approximately three weeks.
 

 Defendant never served in the military. He never married but admitted to fathering one daughter, whose age was estimated at fourteen years at the time of defendant’s trial in 2006. Defendant stated that his child lives with her mother and that he has no contact and pays no support for her. Defendant declined to comment on whether he had fathered additional children.
 

 Early on, defendant began abusing alcohol and drugs. He testified that his “favorite drug of choice is powdered cocaine.” In 1988, when he was seventeen years old, defendant overdosed on cocaine and his mother sent him to BRGH-CDU for treatment. He stayed only one week of the 45-day program, but while there, underwent a comprehensive neuropsychological evaluation by Dr. Rostow, which yielded a full-scale IQ of 73 on the WAIS-R.
 

 In a 1988 report, the BRGH-CDU assessed defendant’s personality as “habitual, maladaptive methods of relating, behaving, thinking and feeling.” Likewise, eighteen |46years later, Dr. Cenac’s report reflected the following assessment of defendant’s personality:
 

 He is impulsive and fails to plan ahead. He makes decisions without forethought, and, without consideration for the consequences to others. He has a pattern of aggressive irritability.... His behavior is consistently irresponsible. He shows no remorse, other than to provide the rationalization that he could not have shot the police officer as he did not have a gun.
 

 According to the UCSR, although defendant had no juvenile criminal record, his lengthy adult criminal history began at age eighteen. Seven incidents were detailed extensively at trial by Dr. Cenac. Dr. Cenac’s report also included a “sample” of infractions defendant amassed while incarcerated in DOC. All of these incidents demonstrate a propensity for violence and anti-social behavior.
 

 The 35-year-old defendant testified at the guilt phase of his capital trial, and in so doing, undercut his defense of mental retardation. His testimony revealed a street-sawy drug abuser who was skilled at manipulation of others and possessed an outsized ego, explained by Dr. Cenac as a defense mechanism. His testimony demonstrated a resentment of authority, and
 
 *899
 
 revealed that he felt like the world was out to get him whenever he got into trouble rather than own up to responsibility for his actions.
 

 At the penalty phase, the defense presented two witnesses: defendant’s father, Sammy Williams, and his stepfather, Michael Robinson. Sammy Williams was also interviewed by probation and parole after defendant’s capital sentencing and expressed that “Shedran had a good childhood and I tried to make a good life for him.” However, in his testimony, defendant’s father admitted that defendant got in with the wrong crowd. Like his father, defendant’s stepfather was also a corrections officer at Hunt Correctional Center. As a former military man, Robinson tried to motivate and |47mentor defendant but his efforts did not yield success, only disagreements: “Shedran didn’t like me to tell him about the rules within the house.” Robinson testified that defendant has a “high temper, like angry, he wanted just to have his way, he just wanted to have mostly control of certain things ... just wanted to come in and take control of everything.”
 

 On May 25, 2006, the court imposed the sentence of death, as unanimously recommended by the jury.
 

 Passion, Prejudice, and Other Arbitrary Factors
 

 The first degree murder of Lt. Vickie Wax occurred on May 22, 2004, and following jury selection, trial commenced on March 20, 2006, just under two years after the crime was committed. Because the victim was a Baton Rouge Police Officer, killed in the line of duty, the incident garnered much publicity at the time of the offense.
 

 Although the defense moved for a change of venue, that motion was ultimately denied and the parties were able to conduct voir dire successfully and seat a jury of 12, plus one alternate juror, without encountering a prospective juror who indicated that pre-trial publicity was so widespread as to affect his/her ability to render a fair and impartial decision. Although several prospective jurors were generally aware of the news surrounding defendant’s case, during voir dire, no one indicated he or she was unduly prejudiced by reports of defendant’s crime and had reached a fixed opinion of . his guilt. Trial counsel never reurged the motion for change of venue throughout jury selection.
 

 The victim, Lt. Wax, was a Caucasian female, who was 51 years old at the time of her death. Mr. Douget, the Wal-Mart loss prevention agent who was shot, was also Caucasian, while Mr. Wilson, the third victim shot, was an older African-American 148male. Race does not appear to be a motivating factor in the shooting of Lt. Wax. Defendant’s jury was composed of two African-American females, eight Caucasian males, and two Caucasian females. The alternate juror was a Caucasian female. There has been no showing that defendant’s capital trial was conducted with any racial taint.
 

 In previous argument, defendant cited various instances in which prosecutorial misconduct allegedly interjected arbitrary factors into the proceedings. However, as we have previously found, these claims are without merit and do not require reversal. We do not find anything in the record to support a finding that the defendant’s conviction and sentence of death were the result of passion, prejudice, or other arbitrary factors.
 

 Aggravating Circumstances
 

 The state relied on three aggravating circumstances under La.Code Crim. Proc. art. 905.4(A), and the jury returned the verdict of death, agreeing that two aggravating circumstances were supported by the evidence: the victim was a peace
 
 *900
 
 officer engaged in her lawful duties and the offender knowingly created a risk of death or great bodily harm to more than one person. La.Code Crim. Proc. art. 905.4(A)(2) and (4). All eyewitnesses to the shooting attested to the fact that Lt. Wax was dressed in full police uniform, and Chief Englade informed the jurors that Lt. Wax had served on the police force for 27 years. In addition, the jury heard testimony from the two surviving victims who were also shot by defendant. The jury’s finding of two aggravating circumstances was fully supported by the evidence; consequently, his death sentence is firmly grounded on the finding of those two aggravating circumstances.
 

 Proportionality
 

 Comparative proportionality review is a relevant consideration in determining l^the issue of excessiveness in Louisiana.
 
 State v. Burrell,
 
 561 So.2d 692, 710 (La.1990);
 
 State v. Wille, 559
 
 So.2d 1321, 1341 (La.1990);
 
 State v. Thompson,
 
 516 So.2d 349, 357 (La.1987). This court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding,
 
 inter alia,
 
 a sufficiently “large number of persuasive mitigating factors.”
 
 State v. Sonnier,
 
 380 So.2d 1, 9 (La.1979).
 

 This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
 
 Sonnier,
 
 380 So.2d at 7.
 

 Since 1976, jurors in the 19th Judicial District Court (hereinafter, “19th JDC”), which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately twenty-six occasions, including the current case. Because several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th JDC, we find defendant’s sentence is not disproportionate to those cases. See,
 
 e.g., State v. Broadway,
 
 96-2659 (La.10/19/99), 753 So.2d 801 (defendant and co-defendant Kevan Brumfield shot and killed police officer escorting grocery store manager who was making a night deposit);
 
 State v. Brumfield,
 
 96-2667 (La.10/20/98), 737 So.2d 660 (defendant and co-defendant Henri Broadway shot and killed police officer escorting grocery store manager who was making a night deposit);
 
 State v. Wessinger,
 
 98-1234 (La.5/28/99), 736 So.2d 162 (defendant shot and killed two people, and injured two people during the course of an armed robbery at a restaurant);
 
 State v. Taylor,
 
 93-2201 (La.2/28/96), 669 So.2d 364 (during armed robbery in a restaurant where defendant had previously been an | .^employee, he shot and killed one employee and shot and permanently disabled and paralyzed another);
 
 State v. Robertson,
 
 92-2660 (La.1/14/94), 630 So.2d 1278 (defendant broke into the victims’ home, armed himself with a kitchen knife, and stabbed the two elderly victims to death) (convictions reversed and sentences vacated; trial court erred in failing to sustain defendant’s challenge for cause to an objectionable juror),
 
 after remand, State v. Robertson,
 
 97-0177 (La.3/4/98), 712 So.2d 8 (first degree murder convictions and death sentences affirmed).
 

 This court, where appropriate, will look beyond the 19th JDC and conduct the proportionality review on a statewide basis. Cf
 
 . State v. Davis,
 
 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. In the fairly rare instance that peace officers have been killed in the line of duty in Louisiana, besides
 
 Broadway
 
 and
 
 Brumfield, supra,
 
 this court has observed that
 
 *901
 
 juries have imposed capital punishment for that special circumstance under La.Code Crim. Proc. art. 905.4(A)(2).
 
 See State v. LaCaze,
 
 99-0584 (1/25/02), 824 So.2d 1063 (brother and sister shot along with off-duty police officer working security detail at family-owned restaurant);
 
 State v. Frank,
 
 99-0553 (La.1/17/01), 803 So.2d 1 (same). Based on our review and comparison of these cases, we do not find that the defendant’s sentence of death is disproportionate under the circumstances of this case.
 

 DECREE
 

 For the reasons assigned herein, the defendant’s conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for cer-tiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies |S| his petition for rehearing, the trial court shall, upon receiving notice from this court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before issuing the warrant of execution, as provided by La.Rev.Stat. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. § 15:147; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
 

 AFFIRMED.
 

 *
 

 Retired Judge Philip C. Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Chet D. Traylor.
 

 [1]
 

 . At the time of her death, Lt. Wax was fifty-one years old, and her height was approximately five feet three inches. Douget estimated that at the time of this offense his height was six feet one inch or six feet two inches and his weight was between 260 to 270 pounds. According to defendant’s booking sheet, at the time of his arrest on the instant offense his height was six feet one inch and he weighed 220 pounds.
 

 [2]
 

 .Additional identifications of defendant were made on May 24, 2004. Deangelo Hammond and Jason Martin each gave a statement to the police about the events of May 22nd and viewed the photo lineup, positively identifying defendant. Abraham Washington and Katyn Garnett also positively identified defendant from the photo lineup as the person who stole their Chevy Corsica at gunpoint. Wal-Mart employees Angela Ranson (check-out clerk), James Minor, and Lester Barbier also made positive identifications of defendant, as did Wal-Mart customers who witnessed the murder, Judge Kathleen Richey and Lee Gray. At trial, these witnesses again identified defendant as the shooter.
 

 [3]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [4]
 

 . Several searches of the river were made to no avail; the murder weapon was not available at trial. Defendant's post-arrest statement turned out to be false, because on July 10, 2006, members of the New Orleans Police Department found Lt. Wax's .357 caliber revolver in a stolen vehicle in New Orleans.
 

 [5]
 

 . According to Dr. Cenac, the records, consisting of hundreds of pages, included psychological testing by Dr. Cary Rostow, records from BRGH-CDU, records of some of defendant’s behavior in various correctional facilities, defendant’s arrest record with twenty-one arrests, "statements from the various witnesses to these events,” (apparently referring to the instant charges as well as previous arrests/convictions), police records, and "evi-dentiary records.” Dr. Cenac obtained a personal and familial history, as well as defendant’s educational history.
 

 [6]
 

 . Much of the state’s cross-examination focused not on Dr. Cenac’s opinion on defendant’s sanity or mental status at the time of the offense, but on Dr. Cenac’s diagnosis that defendant is mentally retarded, an issue discussed below. Notably, even defense counsel in closing arguments, ostensibly in an attempt to bolster his witness’s credibility before the jurors, admitted that Dr. Cenac might have come across as "arrogant” and perhaps not likable.
 

 [7]
 

 . Defendant's step-father, Michael Robinson, testified in the penalty phase that defendant did not like to be touched, and that arguments with him could escalate into a physical encounter if he did not calmly reason with defendant.
 

 [8]
 

 . Likewise, Ranson, the Wal-Mart cashier who rang up defendant’s purchases and with whom defendant struck up an extended conversation during the check-out, testified that defendant did not appear to be intoxicated, nor did she notice anything unusual or out of the ordinary about his demeanor. Similarly, when the prosecutor asked the Wal-Mart store detective, Douget, “Did you observe the defendant mumbling, stumbling, talking out of his mind, or anything of that nature,” his response was, "No, sir.”
 

 [9]
 

 . The procedure for raising a claim of mental retardation is governed by La. Code Crim. Proc. art. 905.5.1(B), which requires a defendant raising such a claim to do so in writing within the time period for filing pretrial motions under La.Code Crim. Proc. art. 521 (all pretrial motions shall be filed within 15 days of arraignment). In the present case, the
 
 *880
 
 defense, though it did not do so within 15 days of arraignment, eventually gave notice to the state of the mental retardation claim when it provided the state with Dr. Cenac’s report after voir dire had commenced, a delay that understandably raised the hackles of the state. However, the record shows that the parties and the trial court were apparently well aware that a claim of mental retardation was certain to be made by the defense, but the trial court eventually had to explain to the jury the defense’s late timing in raising the claim. During the defense's closing argument at the penalty phase, counsel attempted to cast doubt on the credibility of the state’s rebuttal expert, Dr. Hoppe, for not having examined defendant, which prompted the prosecutor’s objection under La.Code Crim. Proc. art. 905.5.1(F). As a result, the court informed the jury how the procedure for claiming mental retardation had played out in this case, namely that the defense did not file timely notice that it would claim mental retardation.
 

 [10]
 

 . According to the DSM-IV, the essential feature of mental retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV, p. 41.
 

 General intellectual functioning is defined by the intelligence quotient (IQ) obtained by assessment with one or more of the standardized, individually administered intelligence tests.
 
 Id.
 
 Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately two standard deviations below the mean).
 
 Id.
 
 “ 'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.”
 
 Atkins,
 
 536 U.S. at 309, 122 S.Ct. at 2245, n. 3 (quoting DSM-IV, pp. 42-43). There is a measurement error of approximately 5 points in assessing IQ, depending on the test used; therefore, mental retardation can be diagnosed in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. DSM-IV, pp. 41-42.
 

 Adaptive functioning or behavior refers to how effectively an individual copes with common life demands and how well he meets the standards of personal independence expected of someone in his particular age group, sociocultural background, and community setting.
 
 Id.,
 
 p. 42. Adaptive functioning is determined from independent sources, such as teacher evaluations and educational, developmental, and medical histories, and/or through the application of scales designed to measure adaptive functioning or behavior.
 
 Id.
 

 [11]
 

 . As to the claim of mental retardation, the trial court during the penalty phase instructed the jury as follows:
 

 A defendant who is mentally retarded may not be subjected to the death penalty. In determining whether the defendant is mentally retarded, you should consider all of the evidence presented bearing on the defendant's mental condition, including the testimony of experts and other witnesses, and the conduct and actions of the defendant.
 

 The defendant must prove his claim of mental retardation by a preponderance of the evidence. Mental retardation is a disability-
 

 Mental retardation is a disability characterized by significant limitations in both intellectual functioning and adaptive behavior, as expressed in conceptual, social, or practical adaptive skills. The onset must occur before the age of eighteen years.
 

 Thereafter, the trial court read to the jurors the diagnoses listed in La.Code Crim. Proc. art. 905.5.1(H)(2)(a) through (s). Finally, the court instructed the jury: “If you unanimously find, by a preponderance of the evidence, that the defendant has proven that he is mentally retarded, this determination shall serve as a bar to the sentence of death in this case, further deliberations are not necessary. However, should you fail to unanimously find that the defendant is mentally retarded, you may consider any evidence regarding his mental condition as a mitigating circumstance in your consideration of proper sentence in this case.”
 

 [12]
 

 . Dr. Rostow’s report, which was not introduced in evidence but is part of the trial record, is dated June 22, 1988, and defendant's date of birth is September 30, 1970; therefore, defendant was seventeen years of age at the time of the testing. Dr. Rostow conducted a battery of tests on defendant, including the Wechsler Adult Intelligence Scale-Revised (hereinafter, “WAIS-R”). With a full scale IQ of 73, defendant's IQ placed him in the DSM-IV category of mild mental retardation, according to Dr. Rostow’s report.
 

 [13]
 

 . Dr. Cenac observed that in discussing these violations of the law with defendant, he adopted a vernacular such as “remanded on a prior charge,” which the witness found "startling” because those were terms attorneys would use. Dr. Cenac believed that defendant understood what was transpiring in the courtroom. "He can assist [ ] his attorney in his defense. He understands what a counsel is, he understands the role of the judge. He understands the role of the jury. He understands the difference between the prosecuting and defense attorneys.”
 

 [14]
 

 . The first IQ test was conducted in the school setting some years before 1988; the second test was upon admission to BRGH-CDU in 1988; a third test was at Hunt Correctional Center in 1996; and a fourth IQ test was also administered at Hunt Correctional Center in 1999.
 

 The Hunt Correctional Center records, the subject of much of defendant's argument to this court, include two clinical screening reports, one from 1996 and the other from 1999, by that correctional center’s psychology department upon defendant’s incarcerations at that facility. The Hunt records were not introduced in evidence at trial, but they were made part of the trial record through the State's subpoena under La.Code Crim. Proc. art. 66, as the defendant concedes in brief. In the 1996 report, defendant’s performance on the Test of Nonverbal Intelligence (hereinafter, "TONI”) indicated his "[¡Intelligence is estimated to be within the 72 to 78 range.”
 
 *885
 
 In the 1999 report, defendant’s performance on the second edition of the TONI indicated that his '‘[ijntelligence is estimated to be within the 73 to 77 range.”
 

 [15]
 

 . The subpoena returns show that the subject records were made available to defense counsel well in advance of trial. Although the state had obtained all of the records from the Department of Corrections [hereinafter "D.O.C.”], and informed defense counsel of that fact, even offering the defense a copy, counsel preferred that "even if the state provided what they said is the entire D.O.C. record [,] we want it to come from D.O.C.” The trial court noted to counsel that he and the defendant could request the records themselves directly from the D.O.C. Elsewhere, it appears from the record that the trial court also received the D.O.C. records, and, after reviewing them, stated it would give a copy to the defense and place another copy in the record. Thereafter, defendant was permitted to change his plea to not guilty and not guilty by reason of insanity. Eventually, defense counsel indicated to the court that all discovery motions had been satisfied.
 

 [16]
 

 . Additionally, defendant’s full scale score of 73 on the WAIS-R, with a margin of error of four points, possibly places his actual IQ at some number approximately equal to or below 70. For example, in
 
 State v. Williams,
 
 01-1650, pp. 23-24 n. 26 (La.11/1/02), 831 So.2d 835, 853-54 n. 26, we observed that "an IQ of 70 could range from 66 to 74 assuming an SEM [standard error of measurement] of 4." Yet, defense counsel in this case did not question either his own expert witness or the State's expert witness about a standard error of measurement with regard to IQ scores in general, and certainly not with respect to the defendant's IQ score of 73 as reported by Dr. Rostow and relied upon by Dr. Cenac, to demonstrate to jurors that an IQ score of 73 could fall within the borderline range.
 

 [17]
 

 . Defendant argues the TONI scores from testing conducted at Hunt Correctional Center in 1996 and 1999, see n. 14,
 
 supra,
 
 are not inconsistent with a finding of mental retardation, but fall within the borderline range. Alternatively, defendant contends a TONI test, administered in a group setting and lasting about fifteen minutes, is not a full scale IQ test like the WAIS-R, given individually and lasting a number of hours. Thus, he argues the TONI scores should not have been compared to or discussed alongside the WAIS-R score, nor should the TONI scores have been used in a forensic setting. Defendant’s other assignments of error involving the Hunt records are discussed below.
 

 [18]
 

 . As noted previously, the defense introduced Dr. Cenac’s testimony on mental retardation in the guilt phase of trial, even though the issue is properly presented, and was in fact decided, in the penalty phase. There is no indication the defense sought to recall Dr. Cenac in the penalty phase, so that he might give an updated opinion with the benefit of the Hunt Correctional Center records. Accordingly, there is no showing the district court's denial of the motion for recess was erroneous.
 

 [19]
 

 . The following reproduced portion of the State's closing argument at the guilt phase contains the language to which defendant points:
 

 Dr. Cenac comes in here and gave some absolutely amazing testimony. The first thing we know is that Dr. Cenac didn't agree with the legal definition of what insanity is, right from wrong. T don't use that standard, but I’m going to go ahead and tell y'all stuff anyhow. When it comes to mental retardation I choose to reject that standard as well. I know it’s suppose[d] to be 70. I know that the test in 1988 showed that Shedran was at least a 73 I.Q., but I just chose to disregard that, because I am the doctor,' despite the fact, as Dr. Hoppe told you that field of expertise clearly requires that the I.Q. be 70. It is a required factor that must be found to determine mental retardation. So, as Dr. Hoppe said, 'Clearly that's out. He’s wrong. He just chooses the wrong standards.' But it even gets worse than that. When questioned about the I.Q. I showed Dr. Cenac in 1996 the defendant’s I.Q. was approximately 78. Didn't change his opinion at all.
 

 Additionally, at the penalty phase, the State made the following argument of which defendant also complains:
 

 When trying to determine mental retardation? There were two issues: I.Q. below 70, of which there apparently has been no evidence introduced to show that. And, and/or, depending on what expert you choose to believe, if you believe Cenac, the DSM-4 that Dr. Hoppe referred to is meaningless, that you can disregard his requirements, if you so choose. That you can say that an I.Q. of 73 would make someone mentally retarded. But we know, clearly, the defendant's intelligence was even higher than that, based upon the evidence presented to us.
 

 [20]
 

 . Argument shall be confined to evidence admitted, to tine lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. La.Code Crim. Proc. art. 774. The argument shall not appeal to prejudice, and the state’s rebuttal shall be confined to answering the argument of the defendant.
 
 Id.
 

 [21]
 

 . Defendant presents his complaint about the prosecutor’s closing argument within his discussion of an assignment of error regarding the prosecutor's cross-examination of Dr. Cenac when the Hunt records came to light, which prompted a defense objection to cross-examining Dr. Cenac with a document the defense did not have. We do not find that trial counsel’s objection to cross-examination during the defense case-in-chief preserved the alleged error stemming from direct reference to the Hunt test score made during closing argument in the absence of a contemporaneous objection. La.Code Crim. Proc. art. 841.
 

 [22]
 

 . Under La.Code Crim. Proc. art. 841, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” This requirement of a contemporaneous objection applies in capital cases both in the guilt phase,
 
 State v. Taylor,
 
 93-2201 (La.2/28/96), 669 So.2d 364, and the penalty phase,
 
 State v. Wessinger,
 
 98-1234 (La.5/28/99), 736 So.2d 162, 180-81 (noting the court retains its independent duty under La. Const, art. I, § 20 (1974), La.Code Crim. Pro. art. 905.9, and La. Sup.Ct. Rule 28 to determine whether the sentence imposed is constitutionally excessive, by carefully examining the record for evidence of passion, prejudice, or arbitrary factors that could have caused the death penalty to be imposed). Thus, a capital murder defendant who does not make a contemporaneous objection to allegedly improper statements of the prosecutor, so as to afford the trial court the opportunity to remedy the error with either a mistrial or an admonition, has failed to preserve for appellate review any claim that the prosecutor exceeded the scope of proper argument.
 
 See State v. Wessinger.
 

 [23]
 

 . Dr. Cenac had previously discussed before jurors the defendant's dangerousness, if somewhat indirectly. At the outset of his direct testimony, as an introduction to his opinion regarding defendant's fear of being touched or grabbed, he recalled his three-hour jailhouse meeting with defendant: "Most remarkably ... Mr. Williams, unlike any other prisoner that I have seen over the years, at the East Baton Rouge Parish Prison, was dressed in a different uniform.... His behavior was restricted by ankle cuffs, handcuffs, and there was a chain around his waist. Unlike any other prisoner, when we walk the hallways, the officers were careful to order all doors locked before he was allowed to enter a hallway. All other prisoners were ordered away from him, two officers accompanied us
 
 *896
 
 at all times.... The security level was the greatest that I have seen.... ”
 

 [24]
 

 . Defendant’s father was employed for 30 years as a security guard at corrections facilities including Elayn Hunt Correctional Center and Louisiana Training Institution. Defendant's mother worked at Baton Rouge General Hospital.