IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,879






JUAN LIZCANO, Appellant



v.


THE STATE OF TEXAS






ON DIRECT APPEAL IN CAUSE NO. F05-59563-QS

IN THE 282ND JUDICIAL DISTRICT COURT

OF DALLAS COUNTY




 Price, J., filed a concurring and dissenting opinion in which Johnson and
Holcomb, JJ., joined.


CONCURRING AND DISSENTING OPINION


 I agree that there is no reversible error affecting the guilt phase of the appellant's trial,
and I concur in the result of those portions of the Court's opinion. But I dissent to the
Court's disposition of the appellant's forty-ninth point of error, challenging the jury's 
finding that he is not mentally retarded. At issue in this case is not simply whether the jury
could rationally find that the appellant is not mentally retarded for purposes of the Eighth
Amendment ban on executing mentally retarded offenders. At issue is the more fundamental
question whether it is the jury that gets to say what the Eighth Amendment standard for
determining mental retardation is in the first place. Because I do not believe that question
is properly delegated to the jury to decide, I am compelled to dissent.

I.

 In his forty-ninth point of error, the appellant argues that the jury's verdict finding that
he did not establish his mental retardation by a preponderance of the evidence is against the
great weight and preponderance of the evidence. This is, in essence, a claim of factual
insufficiency, since it is an issue upon which, we have said, the appellant shoulders the
burden of proof. (1) As such, it is subject to our rule that evidentiary sufficiency should be
measured against a hypothetically correct jury charge. (2) In capital-murder cases, this Court
has jurisdiction to review factual-sufficiency claims. (3) The Court therefore rightly takes up
the appellant's forty-ninth claim. In doing so, the Court measures the evidence of mental
retardation against the definition that was submitted in the court's charge at the conclusion
of the punishment phase of trial. But the Court undertakes no analysis of whether that jury
charge definition was hypothetically correct. It makes a difference.

 The jury's verdict with respect to mental retardation was a general one, in the sense
that it did not explicitly indicate in what respect the jury found the appellant's evidence of
mental retardation lacking. The Court today concludes that to the extent that this general
verdict might have reflected the jury's rejection of the appellant's evidence of significantly
sub-average intellectual functioning as measured by standardized IQ testing, (4) it was against
the great weight and preponderance of the evidence. (5) I agree with this assessment. It is with
respect to the second prong of the definition of mental retardation--the related-deficits-in-adaptive-functioning prong--that the Court today finds the appellant's evidence to be not so
compelling that it must conclude that the jury's verdict was against the great weight and
preponderance of the evidence.

 In coming to this conclusion, the Court measures the evidence of the appellant's level
of adaptive functioning against the definition of "adaptive behavior" (not, it should be noted,
"adaptive functioning") that the trial court supplied to the jury in the charge. That definition
comes from Section 591.003(1) of the Texas Health and Safety Code: "'Adaptive behavior'
means the effectiveness with or degree to which a person meets the standards of personal
independence and social responsibility expected of the person's age and cultural group." (6) 
Presumably, the trial court chose this definition because this Court implicitly endorsed it in
a footnote in Ex parte Briseno. (7) The appellant did not object to this definition, and I agree
that it is hypothetically correct--insofar as it goes.

 But this was not the only definition of adaptive functioning that we mentioned in our
footnote in Briseno. We also noted the definition of "limitations in adaptive functioning"
that was endorsed by the American Association on Mental Retardation (AAMR, now the
American Association on Intellectual and Developmental Disabilities, or AAIDD), viz:
"Impairments in adaptive behavior are defined as significant limitations in an individual's
effectiveness in meeting the standards of maturation, learning, personal independence, and/or
social responsibility that are expected for his or her age level and cultural group, as
determined by clinical assessment and, usually, standardized scales." (8) In Atkins, (9) both
definitions of adaptive deficits noted by the Supreme Court included specific clinical criteria
for measuring adaptive deficits. (10) The AAMR defined adaptive deficits to be "limitations
in two or more of the following applicable adaptive skill areas: communication, self-care,
home living, social skills, community use, self-direction, health and safety, functional
academics, leisure, and work." (11) Similarly, the American Psychiatric Association (APA)
defined (then and now) adaptive limitations to be "significant limitations in adaptive
functioning in at least two of the following skill areas: communication, self-care, home
living, social/interpersonal skills, use of community resources, self-direction, functional
academic skills, work, leisure, health and safety." (12)

 Today the Court fails to take these diagnostic criteria into account in gauging whether
the jury's rejection of mental retardation is against the great weight and preponderance of the
evidence. It is not entirely clear to me why. In Briseno, we noted that the

 definitional question is not before us in this case because applicant, the State,
and the trial court all used the AAMR definition. Until the Texas Legislature
provides an alternate statutory definition of "mental retardation" for use in
capital sentencing, we will follow the AAMR or Section 51.003(13) criteria
in addressing Atkins mental retardation claims. (13)


We ultimately adopted the findings of fact of the convicting court in Briseno, which
expressly found that the applicant had failed to satisfy the "diagnostic criteria" for the
adaptive deficits "prong" of the standard for mental retardation. (14)

 The Texas Legislature has still not acted to define mental retardation in the capital
context, either for purposes of post-conviction habeas corpus review (as in Briseno), or, more
critically today, for purposes of a jury's assessment of mental retardation at the punishment
phase of a capital-murder trial. So, consistent with the "temporary judicial guidelines" that
we announced in Briseno to fill in "during this legislative interregnum," (15) should we not hold
that the hypothetically correct jury charge embraces the diagnostic criteria for mental
retardation? Why today does the Court fail to measure the appellant's sufficiency claim
specifically against those diagnostic criteria? The Court does not say.

 Presumably, the Court does not believe that the jury is bound by the diagnostic
criteria. There is certainly fodder for such a belief in our Briseno opinion. In asking
ourselves how we should go about defining mental retardation in the wake of Atkins, we
noted that the Supreme Court had "left 'to the States the task of developing appropriate ways
to enforce the constitutional restriction [against executing the mentally retarded] upon [their]
execution of sentences.'" (16) We apparently took this to mean that we were free to tinker not
only with the procedural mechanisms for enforcing the Eighth Amendment prohibition, but
also with the substantive definition of mental retardation. (17) Observing that the clinical
definition of mental retardation is deliberately broad so as to ensure inclusiveness in order
to "provide an adequate safety net" in the form of social services "for those who are at the
margin," we questioned whether such a definition was necessarily appropriate to the
"normative" judgment of which capital offenders are sufficiently less culpable than the run
of capital offenders as to justify a categorical exemption from execution. (18) In this context,
we further asked ourselves whether there is "a consensus of Texas citizens [who] agree that
all persons who might legitimately qualify for assistance under the social services definition
of mental retardation be exempt from an otherwise constitutional penalty?" (19) Ultimately, we
"decline[d] to answer that normative question without significantly greater assistance from
the citizenry acting through its Legislature." (20)

 As noted above, we filled the legislative void by (at least provisionally) adopting the
AAMR and Texas Health and Safety Code definitions--without, however, expressly
embracing the specific diagnostic criteria included in the AAMR definition. Instead, we
promulgated certain non-diagnostic criteria of our own--the so-called "Briseno"
factors (21)--and proclaimed:

 Although experts may offer insightful opinions on the question of
whether a particular person meets the psychological diagnostic criteria for
mental retardation, the ultimate issue of whether this person is, in fact,
mentally retarded for purposes of the Eighth Amendment ban on excessive
punishment is one for the finder of fact, based upon all of the evidence and
determinations of credibility. (22)


In failing thus to anchor the fact-finder's decision on the specific diagnostic criteria, we seem
to have granted a certain amorphous latitude to judges and juries in Texas to supply the
normative judgment--to say, in essence, what mental retardation means in Texas (and,
indeed, in the individual case) for Eighth Amendment purposes.

 Or, stated another way (in terms of the actual jury instruction that was submitted in
this case), Briseno would seem to authorize the fact finder to decide just what "the standard"
is in Texas for "personal independence and social responsibility expected of the person's age
and cultural group"--without necessarily taking into account the specific criteria that
diagnosticians in the field routinely use to make that determination. Is the Texas fact-finder
at liberty to define mental retardation differently than a consensus of Americans would define
it for Eighth Amendment purposes? May a particular Texas jury, for example, given the
definition of mental retardation that was submitted in the jury charge in this case, simply
decide that an offender whom the jury believes fits the diagnostic criteria for mild mental
retardation nevertheless meets "the standard" the jury deems appropriate for "personal
independence and social responsibility" relative to his age and cultural milieu?

 Many commentators have construed Briseno to allow just such an untethered fact
finding, and we have been roundly criticized in some quarters for it. (23) Perhaps justifiably so. 
I agree, of course, that whether a capital offender is mentally retarded is a fact issue, and that
it should be left to the fact-finder to resolve in an adversarial context. It should not be an
issue for experts to debate and determine in some inquisitorial process that is alien to our
system of criminal justice. But this does not justify our apparent grant of latitude to fact-finders in Texas to adjust the clinical criteria for adaptive deficits to conform to their own
normative judgments with respect to which mentally retarded offenders are deserving of the
death penalty and which are not. Atkins adopted a categorical prohibition. It was founded
upon the Supreme Court's ratification of the prevalent legislative judgment that it is
inappropriate to execute mentally retarded offenders. That legislative judgment
comprehended mental retardation in essentially the same "clinical" terms as the AAMR's and
APA's diagnostic criteria. (24) Even if the Supreme Court in Atkins "did not mandate the
application of a particular mental health standard for mental retardation, . . . it did recognize
the significance of professional standards and framed the constitutional prohibition in
medical rather than legal terms." (25) It would be anomalous to allow the fiat of a fact-finder
to undermine the essentially diagnostic character of the inquiry. (26) We should not sanction
incomplete jury instructions that would permit a jury, in the guise of "fact-finder,"
capriciously to deviate from the specific diagnostic criteria in order to conform to its own
normative, necessarily subjective, and certainly unscientific judgment regarding who
deserves the death penalty. (27) I would hold that the hypothetically correct jury charge, against
which we measure the weight and preponderance of the evidence with respect to mental
retardation, should incorporate the diagnostic criteria. In this case, the difference really
matters.

II.

 I agree with the Court that the appellant was not entitled to a judgment
notwithstanding the verdict with respect to the mental-retardation issue just because the
appellant presented experts while the State did not. (28) Lay testimony with respect to adaptive
behavior is not categorically incompetent to refute expert testimony. Moreover, the Court
does a good job of summarizing the lay testimony--both pro and con--relevant to adaptive
deficits. (29) But, curiously, in assessing the weight of the evidence as it relates to adaptive
deficits, the Court does not even mention the appellant's expert testimony.

 The appellant called two experts to the witness stand who testified about his adaptive
deficits. The first was Dr. Antonio Puente, a clinical neuropsychologist and university
professor, and an expert on evaluating mental retardation in native Spanish speakers. Puente
explained that he did not administer any of the standardized instruments for assessing
adaptive deficits, such as "the Vineland or the ABAS test," because "[t]here is no scale
available in Spanish that's normed to these people, that is, Spanish-speakers." (30) Utilizing the
APA's diagnostic criteria, Dr. Puente was able to identify significant adaptive deficits in at
least six of the eleven APA categories: communication, self-care, home living, self-direction,
functional academic skills, and work. The information in support of Puente's opinion
derived from reports provided by the appellant's mitigation investigator and Puente's own
clinical interview with the appellant. Puente admitted on cross-examination that he did not
factor in the circumstances of the instant offense as described to him by the prosecutor, but
opined that, had he done so, he would have regarded them as further evidence of the
appellant's adaptive deficits.

 The appellant's second expert witness was Dr. Kristi Compton, a clinical and forensic
psychologist. By and large, her testimony focused more on the appellant's IQ scores than on
his adaptive deficits. But she did testify that the evidence she had reviewed--the same
information that Dr. Puente had reviewed, plus her own clinical interview--indicated that
"there were adaptive deficits in [the appellant's] childhood" that "seem to dovetail" with his
low IQ scores. Her written report was admitted into evidence for its substantive content, and
so was before the jury. Like Dr. Puente, Dr. Compton utilized the diagnostic criteria for
adaptive deficits set out by the APA in the DSM-IV-TR. She provided a chart in her report
of the appellant's adaptive strengths and deficits, as gleaned from the mitigation
investigator's report. (31) Over the course of the appellant's life, including his childhood and
adolescence, he exhibited adaptive deficits, in her estimation, in at least six of the eleven
APA categories. For four of those six categories, she was unable to identify evidence of any
countervailing adaptive strength: communications, self-care, functional academic skills, and
use of community resources. In concluding that the appellant "shows adaptive deficits in
more than two areas" (which is more areas than is required for a diagnosis of mental
retardation under the APA diagnostic criteria), Dr. Compton observed that, "[w]hile [the
appellant] possesses some adaptive strengths, this does not negate the evidence of his
possessing adaptive deficits since childhood." Moreover, and critically, she observed that
"strengths often co-exist with deficits as [in] all people whether they are mentally retarded
or are of normal intelligence."

 The reason this last observation is critical is because of its bearing on the question of
the weight of the evidence in this case. As one legal commentator has emphasized:

 [O]ne of the key assumptions to be utilized in the application of the AAMR's
mental retardation definition [is] that limitations often coexist with strengths
within an individual. Therefore, the presence of a strength in a particular area
does not negate the coexistence of a limitation in another area of sufficient
significance to establish the adaptive behavior component of the mental
retardation definition. (32)


For this reason, as the Oklahoma Court of Criminal Appeals has recognized, "[u]nless a
defendant's evidence of particular limitations is specifically contradicted by evidence that
he does not have those limitations, then the defendant's burden is met no matter what
evidence the State might offer that he has no deficits in other skill areas." (33) Accordingly, in
gauging the appellant's case for mental retardation, we should examine the strength of his
evidence to show adaptive deficits in at least two of the diagnostic categories, as well as the
strength of the State's evidence (if any) to refute the appellant's evidence of adaptive deficits
in (at least all but one of) the particular diagnostic categories upon which he relies.

 The State presented no expert testimony of its own, with respect to adaptive deficits
or any other of the three prongs of the definition of mental retardation. (34) The appellant's own
evidence of adaptive deficits in at least two of the diagnostic areas is compelling; Drs. Puente
and Compton agreed that the appellant was deficient in the areas of communication, self-care, and functional academic skills. (35) Lacking expert testimony to counter these opinions,
the State resorted to cross-examination and lay testimony in an effort to undermine them. In
my view, the State's effort fell woefully short.

 Communication: With respect to the appellant's communication skills, Dr. Puente
testified:

 On the two tests that measure ability to communicate, he's functioning
between eight and ten years of age.[ (36)] And the historical information, there's
some data to suggest that he's very poor at delivering jokes, unable to
understand work instructions. In the past, I've heard from him that he has had
difficulty understanding what his supervisors have told him.


The lay testimony, as summarized by the Court, certainly corroborates this account. It
showed that the appellant was a slow learner, both at school and in the workplace, that he
was reticent to speak, that his vocabulary, even in his native Spanish, was "basic" and his
communications, "simple," that his demeanor was "childish," and that he had substantial
difficultly comprehending jokes and following or retaining instructional information. The
best that the State could muster in response was the testimony of one co-worker that, in his
experience, the appellant was no slower to learn than other workers from Mexico, and that
he sometimes did laugh at the appropriate times. This hardly seems enough rationally to
justify discounting Dr. Puente's reliance upon the preponderance of the evidence indicating
a substantial deficit in communication skills.

 Self-Care: Dr. Puente cataloged the appellant's apparent deficits in this area as
follows:

 A few things to note, and there's several. I don't know if you've ever seen
pictures of them, and where he's purchased his own clothes. He wears clothes
that are very large. He has a picture of himself, which actually is a pretty nice,
handsome picture, but he wears basically bathroom slippers in this picture. So
it's like he's wearing blue jeans and a nice shirt, but bathroom slippers to go
out. This is inapp - inappropriate. He puts on dirty clothes after - after taking
a shower. And in addition to that, he does brush his teeth, but he needs
prompting.


Mara Cruz testified that the appellant could not be taught to read an analog clock or to
program a cell phone. He did not take thorough showers and did not clean his ears or clip
his nails. He had no concept of coordinating his clothes, and wore both clothing and shoes
that were too big. He wore shirts with missing buttons and once put on one of Cruz's blouses
to go out. On cross-examination, Cruz conceded that the appellant had not had clocks
growing up in Mexico, but this does not explain the appellant's inability to be taught to read
an analog clock. The State presented several detention officers to testify that in the
institutional setting of the jail, the appellant could maintain his hygiene and keep his cell
orderly. But evidence of apparent adaptive strengths displayed in an institutional context are
of limited probative value. "A mentally retarded person is . . . likely to show stronger
adaptive behavior in the structured environment of a correctional facility than in society[.]" (37)
"[C]ertain adaptive behaviors (e.g., grooming) may appear better due to the structure" of the
institutional setting. (38) Moreover, it is common knowledge that inmates awaiting trial in jail
are issued standard apparel. Perhaps this explains why the detention officers were not asked
to refute the testimony that the appellant inappropriately dressed himself. Again, the jury
was presented with little compelling reason to reject Dr. Puente's reliance on the data
underlying his assessment of the appellant's ability to take care of his personal needs.

 Functional Academic Skills: Dr. Puente summarized:

 Let me go into a little bit more detail in - in academics. He graduated
from 6th grade at slightly less than 16 years-of-age. He flunked the third grade. 
Was out [of school] probably a total of two, maybe a little longer, three years
possibly. His average score was 7.5. Seven point five, according to the
grading system, is essentially barely passing. In essence, this is not an
individual who did very well even at the grammar school level.


The appellant's sixth grade teacher testified that the appellant still could not read when he
was in her class. To a certain extent, all of the children she taught were behind in their
learning. But the appellant was a particularly slow learner even compared to the other
disadvantaged children he went to school with in an area that was considered remote even
by Mexican standards. She graduated him from sixth grade only because of his age. On
cross-examination of the appellant's cousin, the State established that the appellant had
sometimes missed school in order to work to help support his family. While this may partly
explain why the appellant was so old when he finished the sixth grade, it does not rebut the
teacher's testimony that the appellant was a slow learner even compared to the other
underprivileged students he went to school with. Again, the State offered no convincing
reason for the jury to disregard the information upon which Dr. Puente based his evaluation
of the appellant's academic abilities.

 Perhaps the jury might rationally have disbelieved the experts' opinions with respect
to some of the many diagnostic areas in which, collectively, Drs. Puente and Compton were
able to identify adaptive deficits on the appellant's part. But every mildly mentally retarded
person will exhibit a different assortment of adaptive strengths and deficits, and the jury had
no rational basis to reject any of the three areas in which the appellant's experts agreed he
suffered substantial deficits, much less two out of three of them. That is enough to satisfy
the diagnostic criteria for mental retardation--the standard upon which the jury should have
been instructed in this cause. This conclusion is unaffected by the State's lay testimony from
(1) the detention officer who testified that he had seen a lot of mental illness in his time, and
the appellant did not exhibit any "mental issues"; (2) the other detention officer, whose
personal experience led him to conclude that the appellant was not mentally retarded, but
who could offer no definition of mental retardation; and (3) the used car salesman who saw
nothing "mentally wrong" about the appellant that would dissuade him from selling the
appellant a used truck.

 The Court is correct, of course, that a reviewing court should pay great deference to
a jury in assessing whether its verdict was against the great weight and preponderance of the
evidence. But measuring the evidence against the hypothetically correct jury instruction that
the jury should have received in this cause, I can only conclude that its finding that the
appellant did not prove that he is mentally retarded is, indeed, against the great weight and
preponderance of the evidence. On this state of the record, the appellant cannot be executed
consonant with the Eighth Amendment. I would therefore vacate the jury's finding and
remand the cause to the trial court to conduct another punishment proceeding. (39)

III.

 In Briseno, we decried the "exceedingly subjective" nature of the adaptive-behavior
criteria. (40) And it may well be true that determining mental retardation under those criteria
is as much an art as a science. But it is no solution to this lamentable subjectivity to
substitute the normative caprice of the fact-finder for the comparative scientific objectivity
inherent in the diagnostic criteria. It is not enough that individual jurors might choose to be
guided by the diagnostic criteria, as depicted to them by the testifying experts. The jury
should be explicitly bound to those criteria by the hypothetically correct jury instruction as
the best available scientific basis for distinguishing the mildly mentally retarded offenders
from those who are merely borderline intelligent. Perhaps the diagnostic criteria are
designedly over-inclusive in order to avoid leaving any deserving individuals out of the
social services net. (41) But it seems to me that to err on the side of over-inclusiveness is no less
a virtue in the Eighth Amendment context.

 I am put in mind of the familiar due-process adage that "it is far worse to convict an
innocent man than to let a guilty man go free." (42) The Court's scattershot approach to
adaptive deficits--letting the fact-finder hunt and peck among adaptive deficits, unfettered
by the specific diagnostic criteria that inform the expert opinion--will allow some capital
offenders whom every rational diagnostician would find meets the clinical definition of
mental retardation to be executed simply because they demonstrate a few pronounced
adaptive strengths along with their manifest adaptive deficits. Better, I think, to be over-inclusive and mistakenly sentence some borderline intelligent capital offenders to the not-inconsiderable penalty of life imprisonment without the possibility of parole than to
inadvertently execute even a single mildly mentally retarded offender in violation of the
strictures of the Eighth Amendment. (43) The Court's arbitrary approach today is unfaithful
to--it does not even "generally conform" with--the criteria for mental retardation that was
the basis for the national consensus the Supreme Court found in Atkins. (44)

 To affirming the appellant's death sentence in this case, I respectfully dissent.


Filed: May 5, 2010

Do Not Publish
1. See Meraz v. State, 785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990) (with respect to issues
upon which the defendant is assigned the burden of proof, direct-appeal courts in Texas may review
factual sufficiency of the evidence, asking whether jury's verdict was against the great weight and
preponderance of the evidence); Gallo v. State, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007)
(burden of proof in capital murder punishment proceeding is on the defendant to establish mental
retardation by a preponderance of the evidence).
2. See Wooley v. State, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008) (factual sufficiency
review entails use of hypothetically correct jury charge); Grotti v. State, 273 S.W.3d 273, 281 (Tex.
Crim. App. 2008) (same).
3. Grotti, supra, at 279; Watson v. State, 204 S.W.3d 404, 413 (Tex. Crim. App. 2006); Bigby
v. State, 892 S.W.2d 864, 874-75 (Tex. Crim. App. 1994).
4. In Ex parte Briseno, we defined "mental retardation" for purposes of the Eighth
Amendment's categorical prohibition against executing mentally retarded offenders embodied in
Atkins v. Virginia, 536 U.S. 304 (2002), in the absence of any legislative proclamation on the
subject, to constitute "a disability characterized by: (1) significantly subaverage general intellectual
functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which
occurs prior to the age of 18." 135 S.W.3d 1, at 7 (Tex. Crim. App. 2004) (footnotes and internal
quotation marks omitted). The trial court's charge to the jury at the conclusion of the punishment
phase in this case defined mental retardation in precisely these terms.
5. Majority opinion, at 23-25.
6. Tex. Health & Safety Code, § 591.003(1).
7. 135 S.W.3d at 7 n.25.
8. Id. (emphasis added).
9. Atkins v. Virginia, 536 U.S. 304 (2002).
10. Id. at 308 n.3.
11. Id. (emphasis added), citing the AAMR publication, Mental Retardation: Definition,
Classification, and Systems of Support 5 (9th ed. 1992). In 2002, in its tenth edition of this
publication, the AAMR modified the criteria somewhat, consolidating some of the skill areas and
requiring significant limitations in only one of the three to justify a diagnosis of mental retardation. 
See AAMR, Mental Retardation: Definition, Classification, and Systems of Support 20-23 (10th ed.
2002). These various definitions, "while following developments in consensus in the clinical field,
have retained a consistent core meaning." John H. Blume, Sheri Lynn Johnson and Christopher
Seeds, Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death
Penalty Cases, 18 Cornell J. L. & Pub. Pol'y 689, 696 n.28 (Summer 2009).
12. Id. (emphasis added), citing Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 41 (4th ed. 2000). It was this latter APA definition and clinical diagnostic criteria that the
parties in this case seem to have agreed upon.
13. 135 S.W.3d at 8, citing Tex. Health & Safety Code § 591.003(13), which reads: "'Mental
retardation' means significantly subaverage general intellectual functioning that is concurrent with
deficits in adaptive behavior and originates during the developmental period." The Health and
Safety Code nowhere incorporates the specific diagnostic criteria of the AAMR or the APA.
14. Id. at 18.
15. Id. at 5.
16. Id., quoting Atkins, supra, at 317, which in turn quoted Ford v. Wainwright, 477 U.S. 399,
405 (1986).
17. Legal commentators exhibit stark disagreement as to whether Atkins contemplated that the
various states would have significant latitude to define mental retardation for themselves. Compare,
e.g., Peggy M. Tobolowsky, Atkins Aftermath: Identifying Mentally Retarded Offenders and
Excluding Them From Execution, 30 J. Legis. 77, 85 (2003) ("Rather than dictating the definitional
. . . attributes of the death penalty exclusion, the Court entrusted this responsibility to the states
utilizing capital punishment[.] * * * The manner in which capital punishment states define mental
retardation for purposes of the exclusion from the death penalty will obviously have the greatest
impact on the actual scope of the Court's holding." However, the various states "should ensure that
the definitional provisions in their capital punishment exclusion provisions are at least as
comprehensive as the clinical definitions referenced by the Court in Penry and Atkins."); Judith M.
Barger, Avoiding Atkins v. Virginia: How States Are Circumventing Both the Letter and the Spirit
of the Court's Mandate, 13 Berkeley J. Crim. L. 215, 226 (Fall 2008) ("the Atkins Court left it to
the states to define the term 'mental retardation'"); and Penny J. White, Treated Differently in Life
but Not in Death: The Execution of the Intellectually Disabled After Atkins v. Virginia, 76 Tenn. L.
Rev. 685 (Spring 2009) (Supreme Court in Atkins "declined to establish . . . a uniform definition of
mental retardation . . ., instead deferring the matter to the individual states. The Court's deferral has
resulted in an incongruity with a perverse result: The Eighth Amendment takes on different meanings
in different states."), with Richard J. Bonnie & Katherine Gustafson, The Challenge of Implementing
Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and
Adjudications of Mental Retardation in Death Penalty Cases, 41 U. Rich. L. Rev. 811, 818 & n.26
(May 2007) ("Although the Supreme Court left it to the states to enforce the new constitutional rule,
Atkins did not leave each state free to define mental retardation. * * * Any definition of mental
retardation used to implement Atkins must not cover a smaller group of individuals than the
definition adopted by the American Association of [sic] Mental Retardation.").


 In leaving to the states "the task of developing appropriate ways to enforce" the Eighth
Amendment ban on execution of mentally retarded offenders, 536 U.S. at 317, the Court in Atkins
expressly borrowed from the approach it had taken to implementation of the constitutional ban on
executing the insane in Ford v. Wainwright, 477 U.S. 399 (1986). But any contention that this
approach confers unfettered discretion on the states to substantively define mental retardation in any
way they see fit is belied by the Supreme Court's subsequent decision in Panetti v. Quarterman, 551
U.S. 930 (2007). Panetti makes it clear that the states are not completely free to define insanity for
Eighth Amendment purposes, notwithstanding the wide latitude that Ford afforded them to fashion
various procedures that would satisfy due process. Id. at 954-60 ("It is . . . error to derive from Ford,
and the substantive standard for incompetency [to be executed] its opinions broadly identify, a strict
test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State
has identified the link between his crime and the punishment to be inflicted."). I seriously doubt that,
in conferring upon the states the discretion to prescribe procedural mechanisms to implement the
Eighth Amendment ban on executing the mentally retarded, the Supreme Court intended to permit
the states to define mental retardation less comprehensively than the clinical definitions it cited
approvingly in Atkins. After all, it was largely on the basis of recent statutory enactments that at least
"generally conform" to those clinical definitions that the Supreme Court was able to discern the
emerging national consensus necessary to recognize the constitutional ban in the first place under
Eighth Amendment jurisprudence. 536 U.S. at 317 n.22.


 It is true that, in a post-Atkins opinion, the Supreme Court itself explained that Atkins "did
not provide definitive procedural or substantive guides for determining" mental retardation for
Eighth Amendment purposes. Bobby v. Bies, ___ U.S. ___, 129 S.Ct. 2145, 2150 (2009) (emphasis
added). But in that same opinion the Supreme Court noted that a prior proceeding had not resolved
the issue of mental retardation for purposes of Atkins because no Ohio court had yet "found, for
example, that Bies suffered 'significant limitations in two or more adaptive skills.'" Id. at 2152,
quoting State v. Lott, 97 Ohio St.3d 303, 305, 779 N.E.2d 1011, 1014 (2002). In Lott, the Ohio
Supreme Court adopted a definition of mental retardation that fully embraced the diagnostic criteria
recognized in footnote 3 of Atkins, thus "generally conforming" to the clinical definitions that
informed the Supreme Court's ascertainment of the national consensus. 
18. Id. at 6.
19. Id. Query whether, for purposes of construing the Eighth Amendment, the relevant
consensus would be that of the citizens of Texas. In Atkins, the Supreme Court looked for a national
consensus, which is in keeping with a construction of the Eighth Amendment to the United States
Constitution--and even then, the Court's "own judgment [was] brought to bear by asking whether
there is reason to disagree with the judgment reached by the citizenry and its legislators." 536 U.S.
at 313 (internal citations and quotations omitted). Were we construing the "cruel or unusual
punishment" clause of Article I, Section 13, of the Texas Constitution, then we might be looking for
a consensus among the citizens of Texas. See, e.g., Van Tran v. State, 66 S.W.3d 790, 804-05 (Tenn.
2001) (looking to the "societal view in our own state" in determining that execution of the mentally
retarded violated article I, § 16, of the Tennessee Constitution).
20. Id.
21. Those factors are:



 Did those who knew the person best during the developmental stage--his
family, friends, teachers, employers, authorities--think he was mentally
retarded at that time, and, if so, act in accordance with that determination?

 Has the person formulated plans and carried them through or is his conduct
impulsive?

 Does his conduct show leadership or does it show that he is led around by
others?

 Is his conduct in response to external stimuli rational and appropriate,
regardless of whether it is socially acceptable?

 Does he respond coherently, rationally, and on point to oral or written
questions or do his responses wander from subject to subject?

 Can the person hide facts or lie effectively in his own or others' interests?

 Putting aside any heinousness or gruesomeness surrounding the capital
offense, did the commission of that offense require forethought, planning,
and complex execution of purpose?



135 S.W.3d at 8-9.
22. Id. at 9.
23. See, e.g., Blume, Johnson & Seeds, supra, at 714 ("the Briseno factors focus on a few facts,
which portray stereotype, strength-first or strength-only reasoning, at best a handful of itemized
weaknesses, and are satisfied by answers to those questions alone," thus inviting the fact-finder to
determine mental retardation, vel non, on a basis both less than and different from a full assessment
of all the diagnostic criteria); White, supra, at 705 (criticizing Briseno factors as exemplifying a
"circularity" of reasoning that operates to "evade" Atkins); Carol S. Steiker & Jordan M. Steiker,
Atkins v. Virginia: Lessons From Substance and Procedure in the Constitutional Regulation of
Capital Punishment, 57 DePaul L. Rev. 721, 727-28 (Spring 2008) (The Briseno factors deviate
from the methodology of "professionals in the field, [who] use standardized criteria to detect
significantly subaverage adaptive functioning. Although Texas embraces the standard test for mental
retardation in its health and safety statute, the court-crafted overlay for assessing deficits in adaptive
behavior in capital cases is not grounded in professional practice or guidelines."); Anna M.
Hagstrom, Atkins v. Virginia: An Empty Holding Devoid of Justice For the Mentally Retarded, 27
Law & Ineq. J. 241, 254 (Winter 2009) ("The Briseno opinion made it clear that in Texas, the
ultimate determination of a defendant's mental retardation should be made by the factfinder, not by
experts in the field. Amazingly, the court held that psychological diagnostic criteria do not
necessarily determine whether the defendant is mentally retarded for purposes of the Eighth
Amendment's ban on excessive punishment. * * * Instead, it instructs finders of fact to examine
additional factors--which were invented by the court without any basis in scientific literature or
evidence regarding mental retardation--in order to determine if the evidence indicates that the
defendant is mentally retarded.").
24. See Atkins, supra, at 317 n.22 ("The statutory definitions of mental retardation [contained
in the statutes of those states that had expressly outlawed the death penalty for mentally retarded
capital offenders] are not identical, but generally conform to the clinical definitions" supplied by the
AAMR and APA).
25. White, supra, at 706.
26. Assuming that Atkins did leave to the states the option of defining mental retardation for
themselves, see n.17, ante, the post-Atkins response of a majority of the states that impose the death
penalty has been to include either the APA or the AAMR/AAIDD diagnostic criteria within that
definition--either expressly by statute, see 11 Del. C. § 4209(d)(1); Pizzuto v. State, 146 Idaho 720,
728, 202 P.3d 642, 650 (2008); Bowling v. Commonwealth, 163 S.W.3d 361, 370 n.8 (Ky. 2005); 
State ex rel. Lyons v. Lombardi, ___ S.W.3d ___ , 2010 WL 290391 (Mo., delivered Jan. 26, 2010)
(slip op. at *2); State v. Locklear, 363 N.C. 438, 462, 681 S.E.2d 293, 311 (2009); by judicial
construction of the relevant statute, see In re Hawthorne, 35 Cal.4th 40, 47-48, 105 P.3d 552, 556-57, 24 Cal.Rptr.3d 189, 195 (2005); Phillips v. State, 984 So.2d 503, 511 (Fla. 2008); State v.
McManus, 868 N.E.2d 778, 787-88 (Ind. 2007); State v. Williams, 22 So.3d 867, 880-81 (La. 2009); 
State v. Vela, 279 Neb. 94, 151 777 N.W.2d 266, 308 (2010); State v. White, 118 Ohio St.3d 12, 14,
885 N.E.2d 905, 908 (2008); Howell v. State, 151 S.W.3d 450, 457 (Tenn. 2004); or, in those states
lacking a statute (as does Texas), by judicial directive, see Chase v. State, 873 So.2d 1013, 1027-28
(Miss. 2004); Lambert v. State, 126 P.3d 646, 650 (Okla. Crim. App. 2005). Oklahoma has
expressly included the diagnostic criteria into its jury instructions. See Murphy v. State, 54 P.3d 556,
568 & 570 (Okla. Crim. App. 2002) (adopting Appendix "A," requiring jury to determine: "Does
the defendant have significant limitations in adaptive functions in at least two of the following skills
areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics;
health and safety; use of community resources; and work."). As far as I can tell, a minority of states,
including Alabama (In re Smith v. State, ___ So.2d ___, 2007 WL 1519869 (Ala., delivered May 25,
2007)), Arizona (State v. Grell, 212 Ariz. 516, 135 P.3d 696 (2006)), Arkansas (Miller v. State, ___
S.W.3d ___, 2010 WL 129708 (Ark., delivered Jan. 7, 2010)), New Mexico (which has since
repealed its death penalty) (State v. Trujillo, 146 N.M. 14, 206 P.3d 125 (2009)), Pennsylvania
(Commonwealth v. Vandivner, 599 Pa. 617, 962 A.2d 1170 (2009)), South Carolina (Franklin v.
Maynard, 356 S.C. 276, 588 S.E.2d 604 (2003)), Virginia (Atkins v. Commonwealth, 272 Va. 144,
631 S.E.2d 93 (2006)), and Utah (Utah Code Ann. § 77-15a-102(1) (Supp. 2003)), while embracing
the concept of adaptive deficits, have not (or, in some cases, at least not yet) incorporated the specific
diagnostic criteria into their post-Atkins definitions of mental retardation.
27. The jury in a capital-punishment proceeding in Texas exercises that normative judgment in
answering the third special issue with respect to mitigating circumstances. Tex. Code Crim. Proc.
art. 37.071, § 2(e)(1). But Atkins established that mental retardation is categorically mitigating--as
a matter of law. While the fact-finder in an adversarial system should, of course, decide whether a
capital offender is mentally retarded, it should not be allowed to determine for itself what constitutes
mental retardation for Eighth Amendment purposes.
28. Majority opinion, at 21-22.
29. Id. at 25-28.
30. According to the DSM-IV-TR:


 Several scales have . . . been designed to measure adaptive functioning or behavior
(e.g., the Vineland Adaptive Behavior Scales and the American Association on
Mental Retardation Adaptive Behavior Scale). * * * As in the assessment of
intellectual functioning, consideration should be given to the suitability of the
instrument to the person's socio-cultural background, education, associated
handicaps, motivation, and cooperation.


DSM-IV-TR, at 42. 
31. From her clinical interview with the appellant, Dr. Compton also learned that the appellant:


 reports that he has never lived alone, he has always lived with a family member. *
* * He has never managed a checking account or had a credit card. * * * [He] has
not paid bills independently or on his own. * * * [He] reported that he did not fill
out the forms at Western Union, rather the clerk would complete the form for him. 
* * * He reports navigating by familiar buildings and sites, not by road signs. * *
* He reports being unable to read a map. * * * [He] was asked to tell the time on
a watch. He was unable to do so, stating that he needs a "number clock." [He]
reported that he always got to work on time, but that his brother, not he, set the alarm
clock. * * * [He] obtained a cell phone which was purchased by his girlfriend. He
reports being able to dial the phone, but did not understand how "to put names in."


However, Dr. Compton testified that she does not "personally rely on self-reports on adaptive
deficits because there's no guarantee that they're reporting accurately to me." The reason for this
unreliability, she explained, is that typically a mildly mentally retarded individual will attempt "to
fake not being retarded[.]" See Ex parte Van Alstyne, 239 S.W.3d 815, 822-23 & n.23 (Tex. Crim.
App. 2007) ("mildly mentally retarded individuals often learn to disguise their disabilities in a so-called 'cloak of competence.'"). Of course, the opposite could conceivably be true here--at the time
that he spoke with Dr. Compton, the appellant had a motive to exaggerate his disabilities in an
attempt to avoid the death penalty. Still, his self-reporting is corroborated by the lay testimony
regarding his adaptive deficits as cataloged by the Court's opinion. Majority opinion, at 25-28. 
32. Tobolowsky, supra, at 97, citing AAMR, 10th ed., supra note 53, at 48 (listing among five
assumptions deemed essential to the application of its clinical definition of mental retardation,
"Within an individual, limitations coexist with strengths."). Presumably this essential assumption
applies equally to the APA's clinical definition of mental retardation, with its functionally similar
diagnostic criteria. See Holladay v. Allen, 555 F.3d 1346, 1363 (11th Cir. 2009) ("Individuals with
mental retardation have strengths and weaknesses, like all individuals. Indeed, the criteria for
diagnosis recognizes this by requiring a showing of deficits in only two of ten identified areas [in
the DSM-IV-TR] of adaptive functioning.").
33. Lambert v. State, supra, at 651. The court went on to observe: "In fact, the State need not
present any evidence that a capital defendant can function in areas other than those in which a deficit
is claimed. In capital mental retardation proceedings, the State's first response must always be to
counter the evidence presented by the defendant." Id. In other words, the State's evidence should
be designed specifically to rebut the defendant's evidence of deficits in specific categories of the
AAMR/APA diagnostic criteria. Evidence of adaptive strength in any of the other areas will not
impugn the defendant's case for mental retardation.
34. Dr. Puente did admit that "Dr. [Randall] Price, the State's expert, disagrees with [Puente's]
opinion about the mental retardation" of the appellant. Dr. Puente was not asked, however, and did
not volunteer, whether Dr. Price's rejection of his conclusion was based upon the adaptive deficits
component of the clinical standard for mental retardation. Dr. Puente did testify, however, that Dr.
Price had not had the benefit of all of the underlying data that had been collected to support Puente's
assessment of the appellant's adaptive deficits. He also testified that it was not "scientifically sound
to base a diagnosis of mental retardation only on a clinical interview[,]" thereby implying that Dr.
Price's disagreement with Puente's conclusion may have been based purely on a clinical interview
alone. Dr. Price himself did not testify.
35. They also agreed that the appellant displayed adaptive deficits in the area of work, but
because Dr. Compton believed the appellant demonstrated some concomitant strengths in this
particular area, I do not list it here.
36. Dr. Puente also determined from the testing that the appellant was not malingering.
37. Richard J. Bonnie & Katherine Gustafson, The Challenge of Implementing Atkins v.
Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of
Mental Retardation in Death Penalty Cases, 41 U. Rich. L. Rev. 811, 848 (May 2007).
38. Blume & Johnson, supra, at 720, quoting James R. Patton & Denis W. Keyes, Death Penalty
Issues Following Atkins, 14(4) Exceptionality 237, 249 (2006). Cruz testified that it was after doing
yard work that the appellant would fail to notice he needed to clean grass from his ears. Obviously
the appellant would have no occasion to get grass in his ears while incarcerated pending prosecution
for a capital murder.
39. An appellate finding that a jury's verdict on an issue for which the defendant shoulders the
burden of proof is against the great weight and preponderance of the evidence carries no double-jeopardy consequences. Meraz v. State, supra, at 156. The appellant would not, therefore, be
entitled by virtue of such a finding to have his punishment reformed to a sentence of confinement
to life under Article 44.2511(b) of the Code of Criminal Procedure. Tex. Code Crim. Proc. art.
44.2511(b). Instead, I presume the jury's verdict would essentially constitute trial "error affecting
punishment only," in contemplation of Articles 44.2511(d) and 44.29 (c) of the Code, necessitating
a new punishment proceeding unless "the prosecuting attorney files a motion requesting that the
sentence be reformed to confinement for life" under Article 44.2511(c)(2). Tex. Code Crim. Proc.
arts. 44.2511(c) & (d) and 44.29(c).
40. 135 S.W.3d at 8.
41. Id.
42. In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).
43. In an opinion issued just last week, we expressly declined to deviate from the specific
diagnostic criteria for the first prong of the clinical standard for mental retardation. Ex parte Hearn,
___ S.W.3d ___ (Tex. Crim. App., No. AP-76,237, delivered April 28, 2010). The applicant in that
case was unable to satisfy the significant-subaverage-intellectual-functioning prong of the AAIDD
and APA standards (and the definition in Tex. Health & Safety Code § 591.003(20)), in that he
could not produce evidence of an IQ score that was at least two standard deviations below the mean
for his age group. He therefore resorted to an argument that we should instead accept, for Eighth
Amendment purposes, an alternative measure for significant subaverage intellectual functioning
based upon the results of certain "neuropsychological measures" related to a diagnosis of Fetal
Alcohol Spectrum Disorder. Hearn, supra, slip op. at 8 & 10. I joined the Court's opinion because
the applicant provided no proof of a national consensus for defining mental retardation in this way
so as to establish an Eighth Amendment impediment to execution. While I suppose this Court or
the Legislature could someday choose a definition of mental retardation as a matter of state law that
is more protective than the Eighth Amendment presently dictates, we cannot do so in a post-conviction writ context, wherein we are essentially limited to reviewing claims of federal
constitutional import. Having adhered to the present national consensus for purposes of denying
habeas corpus relief in Hearn, the Court should likewise insist on adhering to it today and apply the
specific diagnostic criteria for adaptive deficits to grant this appellant a new punishment hearing on
direct appeal.
44. 556 U.S. at 308 n.3 & 317 n.22.